**FORWARD COMMUNICATIONS
CORPORATION**

v.

**The UNITED STATES.**

No. 332–74.

United States Court of Claims.

Oct. 17, 1979.

William A. Cromartie, Chicago, Ill., attorney of record, for plaintiff. Michael M. Conway and Hopkins, Sutter, Mulroy, Davis & Cromartie, Chicago, Ill., of counsel.

Iris J. Brown, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant. Theodore D. Peyser, Jr., and Donald H. Olson, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, and DAVIS and KASHIWA, Judges.

## OPINION

PER CURIAM *:

This is an action for the recovery of federal income taxes plus interest claimed to have been overpaid for the taxable years ending June 30, 1962 through 1968. Timely claims for refund were disallowed, and this suit was timely brought thereafter.

Plaintiff, Forward Communications Corporation (Forward), is a corporation with principal place of business in Wausau, Wisconsin. For the taxable years in issue, plaintiff and its subsidiaries were engaged in the business of radio and television broadcasting and newspaper publishing.

On December 1, 1965, plaintiff purchased all of the assets of Station KVTV, Sioux City, Iowa, from Peoples Broadcasting Company (Peoples).[1] The questions presented for determination in this case with regard to the KVTV purchase are:

(1) May plaintiff deduct annually part of the price for the amortization of a 5-year covenant by the seller not to compete?

(2) May plaintiff deduct annually part of the price for the amortization of the Federal Communications Commission (FCC) license it acquired?

(3) May plaintiff deduct as a 1967 loss a portion of the price it paid attributable to a primary Columbia Broadcasting System (CBS) network affiliation contract which it terminated after entering into a new American Broadcasting Company (ABC) network affiliation contract in September 1967?

(4) May plaintiff deduct in 1966 and 1967 against the income from the performance of advertising contracts an allocated portion of the purchase price attributable to such contracts?

(5) Is plaintiff entitled to establish an increased basis for the depreciation of its tangible operating equipment in the absence of such a contention in its claims for refund?

Between October 30, 1964 and September 1, 1967, plaintiff acquired all of the stock of the News Publishing Company of Marshfield, Wisconsin, which published the Marshfield News-Herald, a daily newspaper. On September 30, 1967, plaintiff liquidated the News Publishing Company and received all of its assets under a plan of liquidation qualifying under section 334(b)(2) of the Internal Revenue Code.[2] The issues presented with regard to the newspaper acquisition are the fair market value of (1) the machinery and equipment, and (2) the newspaper's goodwill on September 30, 1967.

Although all of the significant events necessary to determine the issues took place

---

* Parts I, II, IV, V, and VI of this opinion incorporate the opinion of Trial Judge Miller. We disagree with the trial judge's conclusion in part III and have substituted our own discussion. We adopt the trial judge's findings of fact, but do not reprint them because the pertinent facts are adequately set forth in this opinion.

1. The purchase was actually made in the name of Forward of Iowa, a wholly owned subsidiary; but since they filed a consolidated return for all the years at issue, the distinction is of no significance for purposes of this decision.

2. All Code references will be to the Internal Revenue Code of 1954 unless otherwise specified.

from and after 1965, the taxable years 1962 through 1964 are also involved due to loss carrybacks and unused investment credits.

## I. *Covenant Not To Compete*

In 1965, there were only two television stations in Sioux City, Iowa: KVTV, which had a primary CBS-network affiliation, and KTIV, which had a primary National Broadcasting Company (NBC) network affiliation. Both were VHF (very high frequency) stations. Although the FCC had allocated a UHF (ultra high frequency) channel to the Sioux City area as far back as 1952, up through the end of 1965 no one had thought it sufficiently worthwhile to apply for it.

Station KVTV was owned by Peoples Broadcasting Company, a subsidiary of a large insurance company with headquarters at Columbus, Ohio. In March 1965, plaintiff began negotiations with Peoples to purchase that station. From the start, Peoples indicated that it would not sell the station for less than $3.5 million, and plaintiff acquiesced in that basic price. The negotiations thereafter related largely to the clauses which plaintiff desired to include in the agreement of sale.

One of the clauses which plaintiff proposed was a covenant by Peoples that it would not compete with plaintiff in Sioux City for a period of 5 years. The 5-year period was chosen because plaintiff felt that after that period Peoples would lose its effectiveness in the Sioux City market.

On April 26, 1965, Peoples forwarded to plaintiff its draft of the sale contract. The contract set forth the agreed upon $3.5 million price plus reimbursement of Peoples' share of the cost of a new tall transmission tower then under construction for joint use by both Sioux City television stations. Although the parties had discussed the covenant not to compete, the draft agreement did not contain one. After plaintiff conveyed to Peoples its insistence that there be such a covenant, Peoples supplemented its draft by adding a 5-year covenant but did not change the price.

The final contract was executed July 16, 1965. Section 1, entitled "Sale, Assignment and Delivery of Assets", provided for the conveyance by Peoples to plaintiff of the FCC license, the call letters KVTV, the tangible assets and the leases, agreements and contracts pertaining to the business of the station. Section 3, entitled "Purchase Price and Terms of Payment", provided that "the purchase price for the assets purchased hereunder" was $3.5 million plus the seller's costs and expenses incurred up to the closing date in connection with the new tall tower and related facilities. It recited that $150,000 was paid by plaintiff on the execution of the contract, to be held in escrow, and the remainder was due at the closing. The final section of the contract provided in full:

Section 25. *Covenant not to Compete.* Seller agrees not to engage, directly or indirectly, in the business of operating a television station in Sioux City, Iowa, for a period of five years from the Closing Date.

There was no provision in the contract for payment or for any allocation of the purchase price for the covenant not to compete.

At closing, on December 1, 1965, plaintiff paid Peoples a total of $3,928,033.11 in the form of three bank cashier's checks as follows:

| | |
|---|---|
| First National Bank of Chicago | $3,200,000.00 |
| First National Bank of Chicago | 250,000.00 |
| Continental Illinois National Bank and Trust Co. of Chicago | 478,033.11 |
| | $3,928,033.11 |

The $478,033.11 check represented reimbursement for Peoples' outlays in connection with the new tall transmission tower.

Although the $250,000 check then contained no notation as to what it represented, plaintiff's president, Richard Dudley, and its attorney, Stanley Staples, for the first time orally informed Peoples' representatives that the amount on the separate check was what plaintiff was paying for the covenant not to compete. Peoples' representatives were noncommittal. Neither Dudley nor Staples was willing to testify that Peoples agreed to the proposal. Indeed, Staples testified, "I certainly would

not be correct if I stated that the sellers accepted our allocation." Although no representative of Peoples testified at trial, in its income tax return Peoples treated the entire purchase price as the proceeds from the sale of capital assets.

The $3,200,000 represented the remainder of the purchase price.[3]

Plaintiff urges that irrespective of the contract provisions, $250,000 of the $3,928,-033.11 is allocable to Peoples' covenant not to compete and that it is amortizable over the 5-year life of the covenant. Defendant, on the other hand, contends that since the entire contract price was paid for the transferred assets nothing was paid by plaintiff for Peoples' covenant not to compete, and, hence, there was no cost to amortize.

■ A covenant by the seller of a business that he will not compete with the purchaser for a limited period after the sale is often merely a protective device to insure the conveyance of goodwill. In that event, the entire sum received by the seller represents the proceeds from the sale of his capital assets, and correspondingly the purchaser's investment in such assets. On the other hand, where the parties agree that the seller should be separately compensated for his loss of earnings (not from the transferred business but from other sources) for a limited period, where the parties bargain in good faith as to the sum to be paid therefor, and the amount agreed upon has economic reality, then other tax consequences may ensue. The seller may be required to treat the substituted earnings as ordinary income, and correspondingly the buyer may become entitled to deduct them from ordinary income as business expenses. *See Davee v. United States,* 444 F.2d 557, 195 Ct.Cl. 184 (1971), *cert. denied sub nom. Lea Associates, Inc. v. United States,* 425 U.S. 912, 96 S.Ct. 1507, 47 L.Ed.2d 762 (1976); and *Ullman v. Commissioner,* 264 F.2d 305, 307-08 (2d Cir. 1959).

■ In determining whether the amount may be separately allocated to a covenant not to compete, the courts have applied at least four tests, the importance of each varying with the context in which the issue arises—*i. e.,* whether the covenantor is taxable upon part of the proceeds as ordinary income, or whether the covenantee is entitled to deduct part of the payment as an actual or amortizable expense, and whether the taxpayer or the Commissioner is challenging the form of the agreement.

The first of these tests is whether the compensation paid for the covenant is separable from the price paid for the goodwill. This test is aptly stated in *Ullman v. Commissioner, supra* at 307-08:

> It is well established that an amount a purchaser pays to a seller for a covenant not to compete in connection with a sale of a business is ordinary income to the covenantor and an amortizable item for the covenantee unless the covenant is so closely related to a sale of good will that it fails to have any independent significance apart from merely assuring the effective transfer of that good will.

And *see also General Insurance Agency, Inc. v. Commissioner,* 401 F.2d 324, 329 (4th Cir. 1968); *Wilson Athletic Goods Mfg. Co. v. Commissioner,* 222 F.2d 355 (7th Cir. 1955); *Commissioner v. Gazette Tel. Co.,* 209 F.2d 926 (10th Cir. 1954); *Toledo Blade Co. v. Commissioner,* 180 F.2d 357 (6th Cir.), *cert. denied,* 340 U.S. 811 (1950). One rationale for the application of such test, at least with respect to deductions by the purchaser, as is the issue herein, is that where the goodwill and the covenant are closely related the benefits of the elimination of competition may be permanent or of indefinite duration and hence the value of the covenant is not exhaustible or a wasting

---

**3.** The record contains no explanation by plaintiff as to why the remainder was $3,200,000 rather than $3,100,000, as agreed in the contract ($3,500,000 less the $250,000, less the $150,000 escrow payment made on the execution of the contract). Since in its income tax return Peoples reported the total sales price it received for the assets, including its outlays for the tall tower, as $3,928,033.11, as above, it can only be surmised that the $150,000 escrow payment was never in fact made or was returned to plaintiff, and that the $3,500,000 contract price was subsequently adjusted downward by $50,000 for some unexplained reason.

asset to be amortized over a limited period. *See* 4 J. Mertens, Law of Federal Income Taxation § 23.68 (1973 rev.); *Marsh & McLennan, Inc. v. Commissioner*, 51 T.C. 56 (1968), aff'd on other grounds, 420 F.2d 667 (3d Cir. 1969); *Falstaff Beer, Inc. v. Commissioner*, 37 T.C. 451 (1961), aff'd, 322 F.2d 744 (5th Cir. 1963); *Dane County Title Co. v. Commissioner*, 29 T.C. 625 (1957); and *Michaels v. Commissioner*, 12 T.C. 17, 19 (1949).

The second test is whether either party to the contract is attempting to repudiate an amount knowingly fixed by both as allocable to the covenant, the calculable tax effect which may fairly be assumed to have been a factor in determining the final price. This is referred to as the *Danielson* rule, after *Commissioner v. Danielson*, 378 F.2d 771 (3d Cir.), *cert. denied*, 389 U.S. 858, 88 S.Ct. 94, 19 L.Ed.2d 123 (1967). There the sales agreement explicitly allocated a sum to the selling stockholders' covenants not to compete, and in accordance with such agreement the buyer amortized the part of the purchase price which had been allocated to the covenants. Nevertheless, each selling stockholder reported the entire amount received by him as proceeds from the sale of a capital asset. On the sellers' appeals from the imposition of tax deficiencies, the Tax Court upheld the taxpayers' position, finding in effect that the taxpayers had produced strong proof that the amounts allocated by the buyer to the covenants were not realistically arrived at. (44 T.C. 549, 556 (1965).) The Third Circuit reversed the Tax Court. Reasoning that since the amount a buyer of a business pays a seller for his covenant not to compete is ordinary income to the covenantor and an amortizable item for the covenantee, that its reasonably predictable tax consequences may be presumed to have been a component of the overall purchase price for the business, and that its repudiation by one party may have the effect either of a unilateral reformation of the contract with resulting unjust enrichment of one party at the expense of the other or a whipsawing of the Commissioner of Internal Revenue by both, the court applied the following rule (378 F.2d at 775):

[A] party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc.

This court has cited *Danielson* with approval on several occasions. *KFOX, Inc. v. United States*, 510 F.2d 1365, 206 Ct.Cl. 143 (1975); *Dakan v. United States*, 492 F.2d 1192, 203 Ct.Cl. 655 (1974); *Davee v. United States, supra; Eckstein v. United States*, 452 F.2d 1036, 196 Ct.Cl. 644 (1971).

The third test is one of mutual intent. Where there is no precise allocation of the purchase price in the agreement to the covenant not to compete, is there proof nevertheless that both parties intended when they signed the agreement that some portion of the price be assigned to the covenant? The leading case on this test is *Annabelle Candy Co. v. Commissioner*, 314 F.2d 1, 7–8 (9th Cir. 1962). There the court recognized that the covenant had played a very real part in the negotiations and a valuable benefit to the buyer. Despite such fact, the court denied deductions for the amortization of the covenant because—

In the purchase agreement involved in the case before us, there is no allocation of consideration to the covenant not to compete. While this is pretty good evidence that no such allocation was intended it is not conclusive on the parties as would be the case if there had been an express affirmance or disavowal in the agreement. But the petitioner, which was asking for a redetermination of a tax deficiency, had the burden of proving that, notwithstanding the lack of any recital to that effect in the agreement, the parties intended to allocate consideration to the covenant. * * *

* * * * * *

[A]t the time the contract for the purchase of Sommers' stock was executed there was no expressed intention one way or the other as to allocation and tax con-

sequences. It follows that the petitioner failed to sustain its burden of proving that, notwithstanding the lack of any recital to that effect in the agreement, the parties intended to allocate consideration to the covenant.

*Accord, Harvey Radio Laboratories, Inc. v. Commissioner,* 470 F.2d 118 (1st Cir. 1972); *Leslie S. Ray Insurance Agency, Inc. v. United States,* 463 F.2d 210 (1st Cir. 1972); *General Insurance Agency, Inc. v. Commissioner, supra; Delsea Drive-In Theatres, Inc. v. Commissioner,* 379 F.2d 316 (3d Cir. 1967); and *Rich Hill Insurance Agency, Inc. v. Commissioner,* 58 T.C. 610 (1972).

The fourth test is whether the covenant was economically real. The essence of this test is that however the parties divide up the purchase price they cannot prevent the Commissioner from attacking the allocation to the covenant not to compete as sham or unreal rather than the product of bona fide bargaining. *See Harvey Radio Laboratories, Inc. v. Commissioner, supra* at 120.

The role of this test was stated in *Balthrope v. Commissioner,* 356 F.2d 28, 31 (5th Cir. 1966)—

Courts generally honor the parties' bargaining for tax consequences dependent upon the price of a vendor's covenant not to compete. [Citation omitted.] But there are limits. Courts need not honor a vendor's covenant which has no basis in economic reality.

Or, as put in *Schulz v. Commissioner,* 294 F.2d 52, 55 (9th Cir. 1961), "[T]he covenant must have some independent basis in fact or some arguable relationship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement."

Plaintiff distorts this test by claiming that it allows a purchaser to support an allocation for the covenant, even though there is an absence of mutual intent, *i. e.,* where he could not persuade the seller to place any value on it. In *Leslie S. Ray Insurance Agency, Inc. v. Commissioner, supra* at 212, the court met just such an argument with the following response:

Plaintiff's seeming contention, * * * that it may allocate without any agreement, by proving the fair and reasonable value of the covenant not to compete, finds no support in the cases. In this well-traveled area we do not propose to lay out a new path.

And in *Harvey Radio Laboratories, Inc. v. Commissioner, supra* at 120, the same court further explained:

While we do not agree that a taxpayer, to suit his convenience, can freely avoid the consequences of his agreement by showing that the "economic realities" were otherwise, we have no quarrel with those cases which accord such an option to the Commissioner. * * * The parties are free to make their own agreement. The Commissioner, on the other hand, has to deal with the apparent agreement he is faced with. It does not seem unfair that he should be less strictly bound to its bona fides than are the parties themselves. [Citations omitted].

Plaintiff cites two cases as authority for use of the economic reality test to support allocation of part of the purchase price to the covenant where no allocation was provided in the agreement and there was no proof of intent by the parties to make such an allocation: *Kinney v. Commissioner,* 58 T.C. 1038 (1972), *acq.* 1974–2 C.B. 3, and *Allison v. United States,* 25 AFTR 2d 70–1107 (E.D.Cal.1970). Both involved sales of highly personal service businesses: *Kinney,* an insurance agency; and *Allison,* an accounting practice. Both agreements failed to allocate any value to the covenants of the sellers not to compete. In both, however, it was the Commissioner, and not the parties to the agreement, who challenged the agreements as shams and not reflecting economic reality. The courts agreed and required the sellers to include parts of the proceeds in ordinary income. As another court characterized the *Allison* holding, "Just because the parties failed to make an allocation with respect to the value of the covenant, does not prevent the Internal Revenue from assigning a value to the covenant." *Shields v. United States,* 34 AFTR 2d 74–5649, 74–5650 (W.D.Tex.1974).

Neither is authority for the argument advanced by the plaintiff here that a party to a voluntary agreement, who has failed to persuade the other side to place a value on his covenant not to compete, may unilaterally amend the agreement to make such an allocation in his own favor without changing the total price. Moreover, *Kinney* met the intent test. In *Kinney*, both parties did intend that the covenant should have value—they simply could not agree on the proper amount. The Tax Court has itself noted that the rationale of *Kinney* is limited to such facts.[4]

Plaintiff's argument for the amortization of its $250,000 allocation to the covenant not to compete fails to satisfy any of these tests.

First, the covenant was not a separable wasting asset but merely protective of the goodwill plaintiff acquired in the purchase. There was no evidence that Peoples had any plans to return to the Sioux City market right after it sold its station and transferred its license to plaintiff. Peoples could not have competed with plaintiff without an FCC license, and it could only have obtained such a license by purchase of the other existing television station in Sioux City or by applying for the long-unused UHF channel. In its application for transfer of its existing license to plaintiff, Peoples represented to the FCC that its reason for the transfer of the license to plaintiff was that it desired—

> to concentrate its resources on the operation of its existing and newly-acquired broadcast properties, on its plans for the development of UHF television in Columbus [Ohio], and on the properties closer to Columbus, its home base of operations.

Plaintiff's president testified that his concern was that after Peoples obtained its $3.5 million from the sale, with $1 million of the proceeds it could turn right around, put a UHF station back on the air in Sioux City

and be a substantial direct competitor. He felt Peoples would have a substantial advantage "that could be classed as goodwill" in that three to five of its principal personnel had ingrained themselves within the community. However, he thought the 5-year covenant was enough for plaintiff to acquire such goodwill because "that was a period of time that they would lose their effectiveness within the market", while "[i]f I've been in the market for five years and I get to know people within that market, then I have no problem, and I don't care who * * * wants to be my competitor." Thus, the covenant was closely tied to the acquisition of goodwill. It protected the goodwill until it no longer needed protection. At the expiration of the term of the covenant plaintiff would not suffer a loss but would have a continuing benefit from the preservation of its goodwill. *Cf. Golden State Towel and Linen Service v. United States*, 373 F.2d 938, 179 Ct.Cl. 300 (1967); and *Meredith Broadcasting Co. v. United States*, 405 F.2d 1214, 1229, 1231, 186 Ct.Cl. 1, 28, 30 (1968).

Plaintiff asserts that it complies with the second test, the *Danielson* rule, because at the closing it delivered a separate $250,000 check to Peoples, that it informed the latter that it was allocating that sum to the covenant not to compete, and that Peoples accepted the check. Therefore, plaintiff concludes, both buyer and seller agreed to a specific allocation of $250,000 for the covenant and the parties are now bound by that allocation.

For different reasons, defendant also relies on *Danielson*. Defendant avers that the sales agreement unambiguously assigned the full purchase price to the assets not including the covenant not to compete and therefore the parties assigned a zero value to the covenant. It also points to section 23 of the agreement which recites

---

4. In *Baldarelli v. Commissioner*, 61 T.C. 44, 51 (1973), the court stated:

"In *Harry A. Kinney* * * * parties to an agreement failed to allocate any portion of the sales price to the covenant not to compete because they could not agree on an allocation.

For various reasons we found in the *Kinney* case that the covenant had substantial value, not the least of which was the agreement between the parties that it had value. * * * *" And *see also Valley Broadcasting Co. v. Commissioner*, ¶ 74,247 P–H Memo TC at 74–1027.

that the agreement contains the entire understanding of the parties and may not be modified or amended except by written agreement of the parties. Therefore, it concludes, plaintiff is bound by the zero dollars allocated to the covenant.

Neither party's position is persuasive. The short answer to plaintiff's contention is that the *Danielson* rule does not bind the Commissioner to the terms of any formal agreement or transaction, but only bars the taxpayer from repudiating it as against the Commissioner.[5] Contrary to both parties' contentions, the record indicates that no value was specified in the sales agreement for the covenant not to compete, neither zero nor $250,000. While the evidence reflects that plaintiff made an attempt, at the closing, to place a $250,000 value on the covenant, Peoples never indicated in any way its approval. Peoples' acceptance of the check cannot be taken to mean acceptance of the proposal, because under the sales agreement Peoples was entitled to the full purchase price without any strings attached. Moreover, there is no testimony in the record that plaintiff made its tender of the purchase price conditional upon Peoples' acceptance of the allocation.

That plaintiff cannot meet the third test, that there be mutual intent to allocate $250,000 or some other value to the covenant, is apparent from the record. From the start of the negotiations in March 1965, Peoples insisted on the $3.5 million price for the assets other than the tall tower and taxpayer agreed to pay it. Peoples' first draft of the contract, which contained no covenant not to compete, stated that the "purchase price for the assets" was to be $3.5 million plus its out-of-pocket cost for the tall tower. When Peoples added the covenant that it would not compete for 5 years, there was no reduction in the stated purchase price for the assets. The contract was executed by both parties on July 16, 1965, without any mention by either of a separate allocation or consideration for the covenant not to compete. It was not until the closing on December 1, 1965, when the terms of the purchase and sale had been fixed for more than 4 months, that plaintiff first informed Peoples that it was paying $250,000 less than had been agreed upon for Peoples' assets and allocating that sum as compensation for Peoples' covenant not to compete. It was not a condition of the closing that Peoples agree to such an allocation, and plaintiff's president, Dudley, and its attorney, Staples, conceded that Peoples did not agree. Indeed, in its income tax return for that year, Peoples treated the entire sum received as proceeds from the sale of capital assets.

Nor can plaintiff meet the requirement of the fourth test, that there be economic reality to its $250,000 allocation to the covenant. There was no showing that Peoples was likely to incur any comparable loss of earnings by not competing in the Sioux City market for 5 years so that it would bargain for $250,000 in substitute compensation. There was no evidence that Peoples had any plans to resume television broadcasting in the Sioux City area. To the contrary, it represented to the FCC that it had made the sale in order to enable it to concentrate its resources on its existing and newly acquired broadcast properties in other areas closer to its home base in Columbus, Ohio. It would not have been an easy matter for Peoples to repudiate such representation in an application for a new license in the same market within a short time thereafter, and it would have conveyed to the FCC the reasonable inference that Peoples' sale of KVTV was a mere trafficking in licenses for profit. Furthermore, the undisputed testimony was that it would have taken 2

5. The *Danielson* opinion itself states (378 F.2d at 774):

"Next, we are not here involved with a situation where the Commissioner is attacking the transaction in the form selected by the parties, e. g., *Schulz v. C. I. R.*, 294 F.2d 52 (9th Cir. 1961). Where the Commissioner attacks the formal agreement the Court involved is required to examine the 'substance' and not merely the 'form' of the transaction. This is so for the very good reason that the legitimate operation of the tax laws is not to be frustrated by forced adherence to the mere form in which the parties may choose to reflect their transaction. * * *"

years to put a new UHF station into operation.

On the other side of the transaction, there was no showing that the $250,000 represented any approximation of what plaintiff stood to lose by Peoples' competition. Plaintiff's president chose the $250,000 because it represented about 7 percent of the purchase price. He alighted on the 7 percent because he had seen some other purchase agreements in the industry which had covenants and the sums allocated to them came out to between 5 and 15 percent of the price, without regard to any other similarities or differences. Although plaintiff claimed it was concerned with the effectiveness of plaintiff's personnel as competitors, the personnel of Station KVTV came over to Forward with the business but plaintiff made no effort to retain them by placing them under contract or otherwise, as for example, was done in *KFOX, Inc. v. United States*, 206 Ct.Cl. 143, 161, 510 F.2d 1365, 1374 (1975).

Accordingly, it is concluded that there was no bona fide mutual allocation of value to the covenant not to compete, that plaintiff has failed to prove that it incurred a $250,000 cost or any other ascertainable sum for a covenant not to compete, and that it is not entitled to amortization deductions for the cost of such covenant as a wasting asset.

## II. *FCC License*

■ Prior to the sale of Station KVTV to plaintiff, the license had last been issued to Peoples on January 14, 1965, for a 3-year period ending February 1, 1968. On October 27, 1965, the FCC agreed to the transfer of the license from Peoples to plaintiff and on January 30, 1968, it renewed plaintiff's license for another 3-year term ending February 1, 1971.

Plaintiff contends that the holder is entitled to depreciate the value of an FCC television-broadcasting license over a 3-year useful life. Plaintiff's position is that: (1) the FCC license represents an intangible asset separate from goodwill and subject to independent valuation; (2) recent developments in the FCC practice have indicated a tighter adherence to broadcast standards and a greater likelihood of a license revocation or denial of a renewal; and, therefore, (3) the period of useful life of an FCC license is ascertainable and for tax purposes should be limited to its 3-year term. The government argues that, because of the high probability of an indefinite succession of automatic renewals, the license does not have a determinable useful life and is thus not depreciable.

Section 167(a)(1) of the Internal Revenue Code provides for a deduction from gross income of a reasonable allowance for the depreciation of property used in the taxpayer's trade or business. Treasury Regulations section 1.167(a)–1(a) (1956) provides that such allowance is to be measured by the cost and by the estimated useful life of the property. The latter is then defined as (§ 1.167(a)–1(b) (1956)) "the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business * * *." With respect to intangibles, Treasury Regulations section 1.167(a)–3 (1956) states that:

> If an intangible asset is known from experience or other factors to be of use in the business * * * for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. * * * An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. * * *

In *Meredith Broadcasting Co. v. United States*, 405 F.2d 1214, 1230–31, 186 Ct.Cl. 1, 30 (1968), and *Miami Valley Broadcasting Corp. v. United States*, 499 F.2d 677, 687, 204 Ct.Cl. 582, 600 (1974), this court found that the FCC television licenses involved did not have determinable useful lives because of the history of almost automatic renewals and the failure of the taxpayers there to show that the licenses at issue did not possess any reasonable prospects of continuity. Similar holdings may be found in *Richmond Television Corp. v. United States*, 354 F.2d 410, 412 (4th Cir. 1965); *Knipe v. Commissioner*, 24 T.C.M. 668, 692–93 (1965),

*aff'd per curiam on other issues sub nom. Equitable Publishing Co. v. Commissioner,* 356 F.2d 514 (3d Cir.), *cert. denied,* 385 U.S. 822, 87 S.Ct. 50, 17 L.Ed.2d 60 (1966); *KWTX Broadcasting Co. v. Commissioner,* 31 T.C. 952, 961, *aff'd per curiam,* 272 F.2d 406 (5th Cir. 1959); and *Times-World Corp. v. United States,* 251 F.Supp. 43 (W.D.Va. 1966).

Plaintiff relies upon the contrary determination in *WDEF Broadcasting Co. v. United States,* 215 F.Supp. 818 (E.D.Tenn. 1963). But in that case, the district court ruled that the "material inquiry here is as to the stated term of the television license in question, rather than as to the custom or practice of the Federal Communications Commission in granting license renewals in other cases", and that it was immaterial that there was "little or no history of failure to renew licenses". (215 F.Supp. at 820.) This legal position has been either explicitly or implicitly rejected in all of the subsequent cases cited.

Between 1949 and 1968, the 20-year period up to and including the last year involved in this case, there were only four commercial television broadcast licenses which were not renewed by the FCC. During that same period of time, there was an average of 343 licensed commercial television stations each year. Since each of those stations had to apply for a license renewal once every year until 1955 and once every 3 years thereafter, then the FCC denied a television renewal application only about 0.1 percent of the time,[6] and there is no indication that the denials were not caused by the licensee's misconduct rather than some other factor.

Plaintiff's license renewal has never been challenged competitively, and as of the valuation date plaintiff had no particular reason to fear that it would be found not to be operating in the public interest or that its license would not be renewed. In the course of its operations, plaintiff has incurred large expenditures for improving

Station KVTV, including $300,000 for a new transmitter. Plaintiff has never hesitated to make an expenditure for the television station because of a possibility that its license might not be renewed.

Finally, plaintiff argues that since the issuance of the decisions in the cited cases, as a result of two court decisions (*Greater Boston Television Corp. v. F.C.C.,* 143 U.S. App.D.C. 383, 444 F.2d 841 (D.C.Cir. 1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971); and *Citizens Communications Center v. F.C.C.,* 145 U.S.App.D.C. 32, 447 F.2d 1201 (D.C.Cir. 1971)), a change has occurred in the attitude and policies of the FCC, so that "a finding of a reasonable certainty of non-renewal * * * or of a reasonably determinable useful life for the FCC license is justified."

In the first of these, the *Greater Boston Television Corp.* case, the crucial fact was that after the FCC had awarded a television broadcasting license to an applicant in a competitive hearing and the decision was on appeal to the court, it came to the court's attention that the original proceeding had been tainted by ex parte contacts by an officer of the applicant with the chairman of the FCC. As a result, the Commission set aside its original award of the license to the applicant and substituted a special temporary authorization. When the time for renewal came up, the FCC ordered that the renewal application should be treated as an original fresh comparative proceeding between the licensee and the other applicants. As a result of the hearing, the Commission approved issuance of the license to a different applicant. On appeal the court held that (143 U.S.App. D.C. at 399, 444 F.2d at 857) "we cannot say that the Commission was unreasonable when in the last analysis it used the tainted overtures of WHDH as a reason for fresh consideration of all applicants, without any special advantage to WHDH by virtue of its operation under lawful but temporary authority."

---

6. Until 1955, a license was granted for a 1-year term and thereafter for 3 years. *See Meredith Broadcasting Co. v. United States, supra,* 405

F.2d at 1230, 186 Ct.Cl. at 30. The arithmetic is: 343 × (6 + 14/3) = 3659; 4/3659 = .00109.

It is difficult to see how this decision may be construed as retroactively casting any substantial measure of doubt on plaintiff's prospects for renewal of its license during the taxable years 1966–1968. To the contrary, in the second case, *Citizens Communications Center, supra,* the court confirmed the relative degree of assurance that a licensee could have had as to renewal throughout the taxable years by noting (145 U.S.App.D.C. at 38, 447 F.2d at 1208), "[I]n the very controversial *WHDH* case [decided by the Commission in 1969], the Commission *for the first time in its history,* in applying comparative criteria in a renewal proceeding, deposed the incumbent and awarded the frequency to a challenger. [Emphasis supplied.]"

*Citizens Communications Center, supra,* invalidated a 1970 FCC policy statement that if a licensee could demonstrate a record of "substantial" service to the community, without serious deficiencies then it would be entitled to renewal and all other applications would be dismissed without a hearing on their own merits. The court held that even in a renewal proceeding all other applicants were entitled to be heard on the merits. The decision does not deal with the merits of any final decision granting or withholding the renewal of a license after a proper hearing. In its opinion the court stated (145 U.S.App.D.C. at 44, 447 F.2d at 1213), "Indeed, as *Ashbacker [Radio Corp. v. F.C.C.,* 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945)] recognizes, in a renewal proceeding, a new applicant is under a greater burden to 'make the comparative showing necessary to displace an established licensee.' 326 U.S. at 332, 66 S.Ct. 148 * * * ." And (145 U.S.App.D.C. at 44 n. 35, 447 F.2d at 1213 n. 35), "The court recognizes that the public itself will suffer if incumbent licensees cannot reasonably expect renewal when they have rendered superior service." Thus, there is little in the decision to warrant the belief that even after 1971 plaintiff's reliance on renewal of its license is any less secure. In any event, *Citizens Communications Center,* decided in 1971, no more than *Boston Television Corp.,* decided in 1970, could make ascertainable the limits of the useful life of plaintiff's broadcast license as of 1966 through 1968.

The next question posed by the parties is the proper portion of the purchase price to be allocated to the FCC license.

Plaintiff's expert witness, Richard P. Doherty, a former economics professor with 9 years' experience as an official of the broadcasting industry trade association and more than 20 years as an appraiser of television stations for buyers, sellers and financing institutions, found it difficult to place any independent value on the license. In his opinion, an FCC television broadcasting license has no separable fair market value. While it has a great value to a station in a profitable market, and without the license the remaining assets have only salvage value, he was of the opinion that such value cannot be determined except as a part of the going-concern value of the business as a whole, since the license cannot be sold independently of such business. If for tax purposes a value has to be placed on it, it was his opinion that ordinarily such value should be limited to the costs incurred in obtaining it from the government without a competitive hearing, *i. e.,* the legal, accounting, engineering and consulting fees necessary to make a proper application for the license. He estimated such costs to total approximately $30,000.

Defendant's expert witness, Edgar C. Henry, a member of a media brokerage firm for 5 years, and an independent appraiser of newspapers and television and radio stations for buyers, sellers and lending institutions for the last 17 years, like Mr. Doherty, ordinarily deems the television license a part of the total intangible assets. He knew of no reason, apart from tax purposes, for making a separate valuation of the license. On the assumption that some separate valuation is essential here, he valued the license at $250,000. However, he could not support it by any evidence of comparable purchases and sales. Instead, he based it merely on figures he had seen used by other television stations.

In *Meredith Broadcasting Co., supra,* 405 F.2d at 1230, 186 Ct.Cl. at 29, the plaintiff did not assign a separate value to the license, and since there was no necessity to find a separate value for it, the court included the license as a part of going-concern value of $175,000. In *Miami Valley Broadcasting Corp., supra,* 499 F.2d at 687, 689, 204 Ct.Cl. at 601, 604, the court found a value of $1,156,495 for the license therein involved, based on 35 percent of the total value of the station, but it did not lay down any standards for fixing such values.

Upon careful consideration, the court finds itself unpersuaded as to the value urged by either side. It is more convinced by the expert testimony that ordinarily the license is not susceptible of independent valuation because it cannot be bought or sold: and any comparison of sales prices for stations with and without licenses would be fruitless, since without a license it is not a station or a business, but a collection of tangible assets having mere salvage value. With respect to a profitable station, the license should ordinarily be worth much more than the cost of obtaining it, but how much more has not been demonstrated on the record in this case.

In view of the determination that the license may not be depreciated or amortized and the failure of the parties here to demonstrate that it is necessary to place a separate value on the license as an aid in ascertaining the value of any other asset, there appears to be no necessity for finding an independent value herein. It will, therefore, be treated as a part of the total intangible value under the broad rubric of going-concern value or goodwill.

III. *Network Affiliation Contracts*

A.** Plaintiff claims a $572,000 deduction for the loss of its CBS-network affiliation contract.

At the time of the purchase of Station KVTV from Peoples, the station had two separate network-affiliation agreements, one with CBS and one with ABC. At that time the only other television station in the

Sioux City area, VHF Station KTIV, was affiliated with NBC and ABC. Plaintiff renewed its ABC contract on June 27, 1966, for the period of May 22, 1966 through May 22, 1968, and renewed its CBS contract on November 28, 1966, for the period September 11, 1966 to March 31, 1967, with a provision for automatic 2-year renewals unless canceled by either party at least 6 months prior to the commencement of a renewed period.

In a network-affiliation agreement, the network agrees to compensate the station for its broadcasting of network-furnished programs and commercials. The compensation is based upon a negotiated hourly rate for broadcasts by the particular station, which the network charges the national advertisers sponsoring the network programs. The network and the station then split the hourly rate in predetermined percentages. In both affiliation contracts, the station's hourly rate was $650. In the CBS contract, CBS agreed to pay plaintiff from 7 to 32 percent of the hourly rate, depending upon the time of day and day of week for the broadcast, with the 32-percent share for prime-time broadcasts. In the ABC contract, ABC agreed to pay 40 percent of the hourly charge for live broadcasts of ABC-furnished programs, and 30 percent for delayed broadcasts.

A television station also receives revenues directly from advertisers or advertising agencies for broadcast of advertisements between, prior to, or after programs. Where such advertisements are for nationally sold products, they are referred to as national spots, while others are referred to as local spots. The national spots are invariably prepared by the advertising agencies and distributed in the form of videotapes. Since, naturally, the spot advertisements adjacent to popular network programs are the most prized and command the highest prices, a television station derives secondary benefits from its network-affiliation agreements. Furthermore, a station may also

---

* Section A of part III of this opinion incorporates, with minor modifications, the trial judge's statement of the facts relating to this issue.

increase its total viewership as a result of its network programs, thus enabling it to charge higher rates for all its advertising. During the taxable years, Station KVTV received about one-third of its revenues from each of the three different sources: networks, national advertising and local advertising.

Because the Sioux City, Iowa, television market in December 1965 had less than three local television stations, Station KVTV was able to have a primary network affiliation with CBS and a secondary network affiliation with ABC, the latter of which it shared with Station KTIV. By having both affiliations, plaintiff had the advantage of being able to choose the most popular ABC programs in addition to its regular CBS schedule. However, the CBS contract prohibited plaintiff from recording the CBS programs for rebroadcast at a different time than received without CBS permission. Plaintiff understood also that if it preempted the CBS-network broadcast time substantially for other purposes (over 20 percent of the time), renewal of its CBS contract, or renewal at the same rates, would have been jeopardized. During the years at issue, plaintiff was aware that CBS had the highest viewer rating among the networks and that if CBS became dissatisfied with plaintiff's performance such network could probably have found a more compliant outlet in the same market in KTIV, which then had NBC. Furthermore, KVTV was motivated by its own spot advertisers' desires to present consistent CBS programming, week-after-week, rather than random selections of ABC and CBS programs.

KVTV did have the option of taping and delaying broadcasts of the secondary affiliation (ABC) programs to hours when they did not conflict with its CBS programs, such as after 10:30 p. m. Although KVTV received a reduced rate of compensation from ABC for such delayed telecasts, it remained advantageous to the station, because ABC would pay it for such broadcasts and the station did not have to purchase syndicated nor locally produced programs to fill in those time periods. Furthermore, the ABC network shows were generally more popular and of higher quality than the non-network programs and more attractive to the spot advertisers.

In plaintiff's operation of Station KVTV, during the period of dual affiliation, KVTV averaged approximately 73.5 hours per week of CBS programming and 6–7 hours per week of ABC programming of which only as little as 1 to 1½ hours was prime time.

At the time that plaintiff acquired Station KVTV, the FCC had allocated a UHF channel for the Sioux City market for more than a dozen years, but no one had applied for it. However, with the maturing of the television industry and the imposition of the requirement in the early sixties that all new receiving sets have UHF capability, plaintiff anticipated that the third station would become operational within 2½ years from 1965. Plaintiff also reasonably assumed that when the third station went on the air, each of the three stations would then exclusively affiliate with a single network.

In mid-1966, when plaintiff learned that an applicant had applied for an FCC license for the UHF station in Sioux City, plaintiff knew that it could not retain both its CBS and ABC affiliations once the third station began broadcasting. The third station actually stated in its application to the FCC that it would have the ABC-network affiliation. Nevertheless, plaintiff believed it had a choice as to which network it would retain or obtain on an exclusive basis, since in a mixed market with both VHF and UHF television stations a network would prefer to be affiliated with a VHF station rather than a UHF station.

In July 1966, William Turner, plaintiff's station manager, began a study to determine which affiliation should be retained. Plaintiff's new tall tower, which had been placed in operation December 6, 1965, extended KVTV's range from a 25-mile radius to a 75–80-mile radius from Sioux City. This had been expected to increase markedly the station's viewership. However, Turner's study reflected that there were six

other CBS-affiliated stations whose broadcast ranges overlapped that of plaintiff and thus detracted from the number of homes viewing plaintiff's CBS-network programs. On the other hand, there were only two ABC-affiliated stations which overlapped plaintiff's coverage and not as substantially as the CBS-affiliated stations, and, in addition, on the fringes of plaintiff's coverage there were community antenna systems with no other ABC-affiliated stations within their reach. Based on the study's findings, and also on Turner's favorable opinion of the abilities of key members of ABC's management, he recommended an exclusive affiliation with ABC rather than with CBS, depending on how favorable a contract could be negotiated. He was of the view that a change to an exclusive affiliation with ABC at that time would result in some loss of viewers in the short term but not in the long term.

Turner and Dudley, plaintiff's president, visited CBS at its headquarters in New York but received no encouragement that CBS would give them better terms than the $650-per-hour rate with 32 percent for prime time. Knowing that ABC had fewer affiliates than either CBS or NBC and was especially interested in expanding its affiliation agreements wherever it could, preferably with VHF stations, they then went to ABC. Although plaintiff's prior arrangement with ABC had been at the rate of $650 per hour with no more than 40 percent for plaintiff's share, in the negotiations with ABC for a primary and exclusive contract Dudley pressed for a rate of $1,000 per hour and a 50-percent share. They compromised on a $900-per-hour rate with a 40-percent share for plaintiff, and Turner and Dudley agreed to recommend it to plaintiff's board of directors.

Plaintiff's board approved their decision to affiliate exclusively with ABC and relinquish CBS, provided an acceptable contract with ABC could be obtained. On April 28, 1967, plaintiff executed a primary affiliation contract with ABC effective from September 1, 1967 to September 1, 1969, providing for a compensation rate of $900 per hour with 40 percent going to plaintiff.

When plaintiff informed CBS of its decision to switch its primary affiliation to ABC, CBS countered with an offer to increase plaintiff's hourly rate by $50 without any increase in plaintiff's percentage, which plaintiff rejected.

Effective September 2, 1967, the day after its primary affiliation with ABC commenced, plaintiff terminated its contract with CBS. On September 5, 1967, UHF Station KMEG commenced broadcasting as the CBS affiliate in Sioux City.

The change in plaintiff's network affiliations had both positive and negative effects on plaintiff economically. On the negative side, plaintiff incurred additional production and sales costs. ABC then provided fewer hours of network programming per week than did CBS, and, therefore, plaintiff had to purchase films or syndicated programs, or to produce local programming, to fill in the full broadcasting day. Plaintiff's 1967 programming costs increased by 12 percent in 1968 (from $226,474 to $253,712), and its national spot sales declined 3 percent (from $357,013 to $346,904). In addition, a rating service report for a week in November 1967, 2 months after the addition of the third station and the change in affiliation, showed that plaintiff's home viewership during evening hours declined by 28 percent over the same week during the prior year when there were only two stations sharing the viewers. However, there is no comparable data for the entire year nor for subsequent periods, and Turner testified that his prediction that in the long range the situation would reverse itself proved out.

On the positive side, plaintiff's network revenues increased as a result of the higher hourly rate and increased percentage for all of its network broadcasts provided in its network affiliation contract with ABC. For the 12 months immediately preceding September 1, 1967, Forward's network revenue was $490,686, while for the 12 months immediately following that date it was $691,935. Moreover, for the 7 months ended June 30, 1966 and the full fiscal year

ended June 30, 1967, KVTV had net losses of $97,572 and $220,667, while for fiscal 1968 it had net earnings before income taxes of $108,655.[7] Its network revenues for fiscal 1968 ($664,616) increased by 34 percent over the prior year ($495,768). Its gross sales from all sources for 1968 were also up by 15.5 percent ($1,497,649 as against $1,296,563).

B. 1. The trial judge stated that the defendant had conceded that the plaintiff had a loss resulting from the termination of the CBS affiliation in 1967 and merely disputed the basis for computing the loss. He nevertheless held that the plaintiff had no recognizable loss upon the termination of that affiliation contract. He noted that "in the year after plaintiff changed to ABC exclusively, with increased hourly compensation, its network revenues greatly increased over what it had received in the previous year from the two networks, and it turned its fortunes around from a $220,677 net loss to a $108,655 net profit."

The trial judge pointed out that section 165(a) of the Internal Revenue Code of 1954 permits deduction of "any loss sustained during the taxable year and not compensated for by insurance or otherwise." He ruled that "even if plaintiff would otherwise have had a loss on its relinquishment of its CBS affiliation, it has failed to establish that it was 'not compensated' by ABC for having done so."

Alternatively, the trial judge held that recognition of the loss was barred by section 1031(a) of the Code, which prohibits recognition of gain or loss resulting from the exchange of property held for productive use in a trade or business solely for other similarly-held property.

We hold that the plaintiff had a recognizable loss in 1967 upon the termination of its CBS affiliation.

Although the government now disputes that it conceded the loss, we think that its

submissions to the trial judge, fairly read, made that concession. Ordinarily a court does not go behind a party's concession of a legal issue and itself undertake to adjudicate a point the parties have decided to remove from contention. We therefore could properly conclude that plaintiff incurred a loss based on the defendant's concession. Because of the probable importance of the issue in future cases and our disagreement with the trial judge's analysis, however, we think it appropriate to discuss the matter.

(a) The findings of the trial judge establish that the dual affiliation KVTV had with CBS and ABC when the plaintiff acquired the station in 1965 was more valuable than a single affiliation would have been, because it provided the station with additional benefits. The trial judge found that

[b]y having two network affiliations, Station KVTV had the advantage of being able to choose the most popular ABC programs to broadcast in addition to its regular CBS schedule, and in a few instances in lieu thereof, thereby obtaining a total program structure superior to either CBS or ABC alone.

He further found that the station's right to take the ABC programs and to rebroadcast them at a time when they did not conflict with CBS programs was

advantageous to the local station because ABC would pay it for such broadcasts, and the station did not have to purchase syndicated shows or locally produced programs to fill in those time periods. Furthermore, the ABC network shows were generally more popular and of higher quality than the non-network programs and more attractive to the spot advertisers.

After the CBS affiliation was terminated in 1967, the plaintiff no longer had these benefits. It therefore suffered a loss in

---

7. Since the CBS contract termination occurred on September 2, 1967, there is some overlap in using the June 30 fiscal-year figures of plaintiff which are reflected on its books. But it is the best evidence available of plaintiff's financial situation at that time, and there is nothing in the record to indicate that those figures do not give a reasonably accurate comparison of plaintiff's pre- and post-contract termination financial status.

that year reflecting the additional value of the second affiliation. This court and the Tax Court have recognized that a TV station that has affiliations with more than one network incurs a loss when any of its affiliations is terminated. *Meredith Broadcasting Co. v. United States*, 405 F.2d 1214, 186 Ct.Cl. 1 (1968); *Roy H. Park Broadcasting, Inc. v. Commissioner*, 56 T.C. 784 (1971); *Miami Valley Broadcasting Corp. v. United States*, 499 F.2d 677, 204 Ct.Cl. 582 (1974).

The trial judge did not disagree with this analysis. Instead he concluded that because plaintiff's network revenues increased after it terminated its CBS affiliation in favor of the ABC affiliation, any loss it may have suffered from the termination of the CBS affiliation was "otherwise" "compensated" within the meaning of section 165(a) of the Code and therefore not deductible.

As noted, section 165(a) permits a deduction for "any loss sustained during the taxable year and not compensated for by insurance or otherwise." The loss plaintiff suffered upon the termination of the CBS affiliation was not otherwise "compensated" for by the additional network revenues it received under its exclusive affiliation with ABC. The provision is designed to insure that before a taxpayer may take a deduction for a loss, he must in fact have realized one, *i. e.*, he has not been reimbursed for the loss, 5 Mertens, Law of Federal Income Taxation § 28.07. If his loss is made whole from some other source, then in actuality he has not sustained a loss. Payment from insurance is one example of such compensation.[8] Another is where the person who inflicted the loss makes it good as a result of litigation or for some other reason.

■ The bar in section 165(a) against a loss deduction thus applies only if the taxpayer has an existing legal right of recovery from some source. For example, in

*United States v. S. S. White Dental Manufacturing Co.*, 274 U.S. 398, 47 S.Ct. 598, 71 L.Ed. 1120 (1927), and *Post v. Commissioner*, 12 B.T.A. 510 (1928), the taxpayers were allowed a deduction in the year of loss despite a later gratuitous payment by another party. In *Parmelee Transportation Co. v. United States*, 351 F.2d 619, 173 Ct.Cl. 139 (1965), where the taxpayer was denied a deduction because of a possible recovery through litigation, the court in so holding rejected an argument similar to defendant's contention here. The taxpayer had lost the value of goodwill relating to one of several businesses in which it engaged. The court ruled that the fact that the taxpayer continued to operate other businesses did not establish that the loss did not result from a closed transaction.

■ The statute does not bar a deduction for a loss actually incurred merely because the taxpayer is able to effect an offsetting gain on a different although contemporaneous transaction. In the present case, plaintiff suffered a loss upon the termination of the CBS affiliation, measured by the value of that affiliation. That loss was not "compensated" under section 165(a) by the fact that plaintiff's new exclusive affiliation with ABC was more profitable than its prior joint affiliation with either that station or CBS.

(b) At oral argument the government attempted to sustain the trial judge's ruling that plaintiff realized no loss on the alternative theory that plaintiff received everything it had purchased when it acquired KVTV. The argument ran as follows: What plaintiff actually acquired was the right to one permanent affiliation and to one temporary affiliation during the interim period until a third station began operating in Sioux City; the termination of the CBS affiliation 2½ years later was in accord with plaintiff's understanding of what would happen when it acquired the station;

---

8. *See, e. g., Shanahan v. Commissioner*, 63 T.C. 21 (1974), construing the phrase "compensated by insurance or otherwise" to be restricted by the rule of *ejusdem generis* to mean only compensation in the nature of insurance. The

court held that section 165(a) barred a deduction for losses suffered by disaster victims who received a government grant in the form of forgiveness of indebtedness.

plaintiff therefore did not realize any loss upon the termination. In colloquial terms, the defendant's argument is that the plaintiff got what it paid for.

What the plaintiff paid for, however, were affiliations with both CBS and ABC. As developed in the next section of this opinion, the CBS affiliation was the more valuable of the two and at that time it appeared likely that KVTV would retain CBS rather than ABC. There is no indication that the plaintiff viewed the transaction as the government now characterizes it or that it suffered no loss when it terminated the CBS affiliation because from the outset it knew that it could not retain both affiliations indefinitely. Indeed, most assets purchased for use in a trade or business are expected to have limited useful lives. That fact, however, does not prevent a taxpayer from taking a loss deduction when the useful life ends.

(c) The defendant does not attempt to defend the trial judge's alternative holding that section 1031(a) of the Code bars the recognition of plaintiff's loss. As noted, that section provides that "[n]o gain or loss shall be recognized if property held for productive use in trade or business * * * is exchanged solely for property of a like kind to be held * * * for productive use in trade or business * * *." The trial judge *sua sponte* raised the applicability of this provision in letters to counsel after the trial had been completed and the briefs filed. The government responded that the change in network affiliation did not constitute an "exchange" within the meaning of section 1031(a).

We agree with that view.

■ For property to have been "exchanged" under section 1031(a), there must have been "a mutual grant of equal interests," "the giving of one thing for another." *Trenton Cotton Oil Co. v. Commissioner*, 147 F.2d 33, 36, *rehearing denied*, 148 F.2d 208 (6th Cir. 1945). "The very essence of an exchange is a transfer of property between owners * * *." *Carlton v. United States*, 385 F.2d 238, 242 (5th Cir. 1967). "The purpose of Section 1031(a), as shown by the legislative history, is to defer recognition of gain or loss when a direct exchange of property between the taxpayer and another party takes place * * *." *Coastal Terminals, Inc. v. United States*, 320 F.2d 333, 337 (4th Cir. 1963). *See also* 3 Mertens, Law of Federal Income Taxation § 20.28.

■ Assuming without deciding that the trial judge correctly viewed the affiliations as "property held for productive use" in plaintiff's business, the termination of the CBS affiliation involved no exchange between the taxpayer and ABC. CBS was not a party, direct or indirect, to the arrangements between the taxpayer and ABC, and ABC was not a party to the termination of the CBS affiliation. The only property plaintiff could be viewed as having "exchanged" for the ABC exclusive affiliation was the secondary affiliation it previously had with that network. The transaction for which the loss is claimed, however, was the termination of the CBS affiliation. Plaintiff received no property from CBS in exchange for giving up that affiliation. Although it was the new exclusive ABC affiliation that led the plaintiff to terminate its CBS relationship, that causal effect did not convert plaintiff's separate transactions with ABC and CBS into an "exchange" of the CBS affiliation for the ABC exclusive affiliation for which section 1031(a) bars recognition of loss.

■ 2. The parties stipulated that "the aggregate value of the two network-affiliation contracts the plaintiff purchased as a part of the total assets on December 1, 1965, was $1 million." Finding 78. They sharply disagree, however, about the size of the loss plaintiff realized when it terminated the CBS affiliation 2½ years later. This disagreement reflects a dispute over what property interest the plaintiff lost.

Plaintiff contends that it lost the independent value of the CBS affiliation. It argues that the CBS affiliation was worth $572,000 and the ABC affiliation $428,000, and that the former figure reflects its loss upon the termination of the CBS affiliation.

It relies on the theory and calculations of its witness Richard P. Doherty, an expert on the broadcasting industry. Doherty determined that in the 12 months preceding plaintiff's acquisition of KVTV, CBS contributed 57.2 percent, and ABC contributed 42.8 percent of the station's total network revenue. He applied those percentages to the stipulated $1 million value of the joint affiliation as a basis for determining the respective value of each affiliation.

The government argues that the proper basis for determining the loss plaintiff suffered upon termination of its CBS affiliation is not the value of that affiliation standing alone, but the additional value to the plaintiff of having a secondary affiliation during the 2½-year period before the third station began to operate in the market. The government's witness, John O'Farrell, an IRS evaluation engineer who is an expert in valuing business assets and stocks of closely held corporations, concluded that the secondary affiliation was worth only one-seventh of the value of the primary affiliation, or $125,000.

O'Farrell relied upon an analysis of the network programs CBS and ABC offered from 6 p. m. to midnight during the week following plaintiff's acquisition of KVTV. "He was of the view that except for a few clearly more popular shows, most of the programs could have only marginally greater popularity than the programs broadcast by the competing network in the same time segments." Finding 81(a). O'Farrell stated that the average broadcaster would have had "a clear basis" for choosing between the CBS and ABC programs in only 24 of the 84 half-hour segments in the period, and that he would have divided them about evenly. He determined that the station would have selected the ABC program in only 12 of the 84 time periods, and that in the remaining 72 time periods KVTV would have selected the CBS programs or the choice of program would have been immaterial.

He concluded that whichever the secondary affiliation it was worth an additional one-seventh of the primary affiliation, and the respective values, based upon the stipulated $1 million value for both contracts, were $875,000 and $125,000. The major value to a station was having a network affiliation, and that while additional affiliations added some value they did not greatly increase it. Finding 81(c). O'Farrell did not use any rating books, and he did not know which programs were better viewed nationally or in Sioux City. Finding 81(d). He acknowledged that his analysis "has no relationship to the programs that were actually broadcast" by KVTV (Transcript, 1001–02).

The government criticizes the plaintiff's valuation on the ground that the earnings each affiliation generated are an improper measure of the worth of that affiliation because "earnings reflected a choice of programming and the station could always change its emphasis to more ABC and less CBS programming." The realities of the television business and the terms of the CBS affiliation, however, imposed constraints upon the station's freedom to choose between CBS and ABC programs that seriously undermine the government's conclusion.

At the time of plaintiff's purchase of KVTV "CBS was the most popular" network (finding 60), had the highest viewer rating and therefore necessarily had the greatest viewer support. If plaintiff had utilized a substantially higher percentage of ABC programs, it ran the risk of a significant drop in viewing with a consequent drop in revenues. KVTV's much greater use of CBS than of ABC programs during the period of dual affiliation, when it averaged 73.5 hours weekly of CBS programs and only 6 to 7 hours weekly of ABC programs (finding 57), presumably reflected the station's business judgment that the CBS programs were preferable. Moreover, there were restraints, both legal and practical, upon the station's ability freely to shift from CBS to ABC programs (finding 55; see pp. 497–498 supra). Thus KVTV did not have the broad freedom to choose between CBS and ABC programs which, according to the government, vitiates the

**504**

reliability of the comparative revenue contributions from the two networks as a fair measure of the value of the respective affiliations.

The foregoing analysis indicates the basic weakness in O'Farrell's own assumption that the choice of programs was immaterial to the station in seven-eighths of the evening broadcasting hours and that the only value of having both a CBS and an ABC affiliation was for the small number of programs where one network was demonstrably superior to the other. This assumption is based largely on conjecture, is highly theoretical and speculative, and is inconsistent with the practical economic realities in the Sioux City market (with which O'Farrell was unfamiliar). These flaws in O'Farrell's theory seriously undermine it and make it an inappropriate basis for valuing the CBS affiliation.

When plaintiff acquired KVTV "it was reasonably predictable and plaintiff anticipated that a new UHF television station would begin broadcasting in Sioux City within 2½ years." Finding 59. At that time, however, plaintiff made no study or determination of which network affiliation it would give up when the third station entered the market. *See* finding 59. It nevertheless seemed probable that, because of the then superior position of CBS, plaintiff would retain its affiliation with that network and drop its ABC affiliation. Plaintiff's decision to follow the opposite course resulted from developments that occurred and studies it made after it had acquired KVTV.

In determining the value of the CBS affiliation when plaintiff acquired it on December 1, 1965, care must be taken not to be influenced by what happened 2½ years later. At the time of acquisition, CBS was the more valuable affiliation, and it appeared likely that KVTV would retain that affiliation when it would be required in the future to choose between the two networks.

Indeed, the applicant for the third channel in Sioux City told the Federal Communications Commission that it would have the ABC affiliation. Finding 62. The fact that the plaintiff did not know at the time of acquisition which affiliation it would retain—although it knew it could retain only one—did not establish that the value of the affiliation the plaintiff ultimately terminated was only the additional value of having a second affiliation for the interim period. To the contrary, as of the time of acquisition, CBS was the more valuable affiliation, and at that time there was no reason to believe that plaintiff subsequently would abandon it.

The cases in which the courts have valued a multiple network affiliation have adopted the analysis plaintiff makes. In *Roy H. Park Broadcasting, supra*, Doherty also was an expert witness for the plaintiff, and he used the same method of valuation employed here, *i. e.*, one based upon the percentage of total network revenues attributable to each of the two affiliations (there, as here, CBS and ABC). Although the Tax Court made certain adjustments in Doherty's calculation, it "accepted the method employed by Doherty in valuing the network contracts," since Doherty's "uncontroverted testimony * * * was lacking in neither credibility or reason." 56 T.C. at 811. In *Miami Valley Broadcasting Corp., supra*, in which the station had NBC and ABC affiliations,, the court allocated 55 percent of the total value of the network affiliations to NBC and 45 percent to ABC. The court apparently approved the valuation method of the station's expert witness, which was based upon the respective contributions to total network revenues the station derived from each affiliation.[9]

In a case such as this, "an accurate allocation of value among the several classes of intangibles is impossible, and we must make the broadest kind of estimate." *Meredith Broadcasting Co. v. United States, supra*, 405 F.2d at 1227, 186 Ct.Cl. at 24, *see also*

---

9. The third case dealing with the value of network affiliations, *Meredith Broadcasting Co., supra*, is not relevant to this issue. There the court determined only the total value of the multiple affiliations as against the value of the other intangible assets the station had when it was purchased. The court did not allocate that total value among the different affiliations.

*Miami Valley Broadcasting Corp. v. United States, supra,* 499 F.2d at 687, 204 Ct.Cl. at 600–601. Considering all the circumstances, we think that the revenues KVTV received from each network in the year before the acquisition is an appropriate basis for allocating the $1 million stipulated value of the joint affiliation between the two networks. We therefore conclude that the plaintiff's loss upon termination of the CBS affiliation was $572,000.[10]

3. The parties disagree over the proper years in which any loss should be deducted. Plaintiff proposes that the loss should be allowed under section 165 of the Code in the year in which the CBS affiliation was terminated. Defendant maintains that the loss resulted from a wasting asset and that any deductions from the basis of the asset should be amortized over the 2½-year period following plaintiff's purchase of KVTV.

Defendant's argument assumes—contrary to our holding—that the size of the loss is to be measured by the value of the temporary advantage of having a dual affiliation. A loss was predictable at the time of plaintiff's purchase. At that time, however, it was not predictable which affiliation, ABC or CBS, would be terminated. Thus, the useful life of the CBS affiliation could not be estimated with reasonable accuracy. Neither affiliation, therefore, was subject to an allowance for depreciation. *See* Treas. Reg. § 1.167(a)–3 (1960). Accordingly, plaintiff was entitled to deduct in the year of termination the $572,000 value of that affiliation.

### IV. *Advertising Contracts*

In the purchase of Station KVTV, plaintiff acquired a number of advertising contracts pursuant to which the station was to receive payments from advertisers for broadcasting commercials over the next calendar year. The aggregate face value of the contracts was $289,727.

Plaintiff did broadcast substantially all of the advertisements by December 31, 1966, and collected approximately $289,000 in gross revenues. Plaintiff reported the full amount received as ordinary income for fiscal years ended June 30, 1966 and 1967. On audit, the revenue agent determined in his report that $170,000 of the total purchase price should have been allocated to the contracts as their value at the date of purchase. Accordingly, plaintiff now contends that it is entitled to deductions of $170,000 against the $289,000 in gross revenues either as a loss or as return of basis for the revenues. Defendant's position is that the contracts constitute a mass asset, the value of which will fluctuate as new contracts are added and old contracts lost, that their life in taxpayer's business is indefinite, and that, therefore, whatever may be their theoretical value it is not currently deductible but rather simply added to goodwill.

Both plaintiff and defendant presented witnesses who testified to the value of such contracts as of the date of acquisition, December 1, 1965. Plaintiff's witness was Gene Anderson, a certified public accountant and plaintiff's vice president for finance. He testified that the value of the contracts was $170,000. Defendant's expert witness was John O'Farrell, an Internal Revenue Service valuation engineer since 1960, who has appraised the business assets and stock of many closely held corporations and testified as a valuation expert in 35 cases. He testified that the value of the contracts was $41,360.[11]

In view of the decision herein that whatever value is allocated to the contracts it is not deductible in any event, it is unnecessary to resolve the conflicting valuations, although summaries and discussions of the

---

10. The parties agreed at oral argument that if we hold that plaintiff realized a loss, we may determine the amount ourselves and need not remand to the trial judge to make the determination.

11. Defendant offered another expert witness, Edgar C. Henry, whose qualifications have also been discussed previously. However, Henry declined to value the contracts as of December 1, 1965, on the ground that they had a continuing value which was a part of the station's going-concern value and it could not be separately valued.

reasoning of the valuation witnesses are contained in the findings.

Since the plaintiff's business was and is a continuing one, it is fair to assume that the mass of customers whose advertising contracts Peoples transferred to plaintiff on December 1, 1965, did not abruptly cease doing business with plaintiff after the particular contracts were performed. Undoubtedly some discontinued their business with plaintiff while others expanded their business and may have even referred other customers to plaintiff; some renewed immediately while others resumed their business after a hiatus. It is uncertain, therefore, as to the extent if any to which the cost of acquiring such customers no longer continued to produce economic benefits for plaintiff after December 1966 and must be written off exclusively against the income for the prior period. For such reasons and also because it would be extremely difficult to allocate to a particular contract the portion of the cost of its acquisition used up in earning the income therefrom, such costs are deemed parts of an "indivisible" or "mass asset" includible in goodwill. Terminations of individual contracts or accounts are treated as diminutions of fluctuations in the value of the larger asset and they are not allowable as losses because they fail to satisfy the requirement that a loss be "evidence by closed and completed transactions, fixed by identifiable events." Treasury Regulations section 1.165–1(b) (1960). *See* the thorough discussion of the indivisible-asset rule in *Sunset Fuel Co. v. United States*, 519 F.2d 781, 783 (9th Cir. 1975).

In *Golden State Towel and Linen Service, Ltd. v. United States*, 373 F.2d 938, 179 Ct.Cl. 300 (1967), the taxpayer purchased two linen service corporations and allocated a portion of the purchase price to the customer lists acquired. The taxpayer attempted to deduct as a loss the cost of acquisition of those customers who ceased doing business with plaintiffs in the year of the termination. The court found that the customer list was an indivisible business property "whose ultimate value lies in the expectancy of continued patronage through public acceptance. It is subject to tempo-

rary attrition as well as expansion through departure of some customers, acquisition of others, and increase or decrease in the requirements of individual customers." 373 F.2d at 944, 179 Ct.Cl. at 310. Thus, the court concluded that "A normal turnover of customers represents merely the ebb and the flow of a continuing property status in this species, and does not within ordinary limits give rise to the right to deduct for tax purposes the loss of individual customers." *Id.; see also Boe v. Commissioner*, 307 F.2d 339 (9th Cir. 1962).

The decision in *Meredith Broadcasting Co. v. United States*, 405 F.2d 1214, 186 Ct.Cl. 1 (1968), applies the same principles to advertising contracts in the radio and television broadcasting industry. The court described the Meredith advertising contracts as follows (405 F.2d at 1229, 186 Ct.Cl. at 28):

> *Advertising contracts.* Among the intangibles acquired by plaintiff were contracts for the sale of radio and television time to various local, regional and national advertisers. These contracts specified the type and frequency of advertising to be performed as well as the rate charged; they had varying periods of time remaining at the acquisition date from one week to one year but none were in excess of one year. The unearned gross revenues at the date of plaintiff's acquisition were approximately $45,000 for radio contracts and $263,000 for television contracts, for a total of $308,000. However, the contracts had additional value because of the probability that some of the advertisers would continue their patronage. On the other hand, the contracts were, in practice, freely cancellable on 28 days' notice.

The court's reasons for holding that the value of the contracts was not deductible were stated as follows (405 F.2d at 1230–31, 186 Ct.Cl. at 29–30):

> [One of] [t]he final questions for our determination [is] * * * whether the $75,000 of cost allocated to the television advertising contracts is amortizable. In the case of intangible assets, it is indis-

putable that a taxpayer is entitled to recover his cost basis through amortization deductions—provided it is shown that such assets have an ascertainable useful life. Reg. § 1.167(a)–3 (1954 Code) and Reg. 118 § 39.23(1)–3 (1939 Code). The difficulty here is that neither the licenses nor the advertising contracts have a determinable useful life. * * * In the case of the television advertising contracts "[t]hese contracts were not purchased as individual contracts. * * * [Plaintiff] purchased a mass [i. e., indivisible] asset whose value will fluctuate as contracts expire and as new contracts are signed. When confronted with this issue * * * [it] has [been] consistently held [that] such a mass asset [is] not depreciable because it did not have a determinable useful life." Westinghouse Broadcasting Co., 36 T.C. 912, 923 (1961), and cases cited, aff'd on other issues, 309 F.2d 279 (3rd Cir. 1962), cert. denied, 372 U.S. 935, 83 S.Ct. 881, 9 L.Ed.2d 766 (1963). It is quite true (as discussed before) that at the time of plaintiff's acquisition of KPHO–TV advertisers had no other stations to turn to and that with the advent of other stations, there was a likelihood that some of them would terminate their contracts with KPHO–TV and deal with the new stations as they came on the air. However, there was also the probability that other advertisers would, in the ordinary course of business, renew their contracts for an indefinite time in the future. "[Plaintiff] must show more than uncertainty as to the length of the * * useful life." Westinghouse Broadcasting Co., supra, 36 T.C. at 921. It must show that the licenses and the advertising contracts did not possess any reasonable prospect of continuity. And this showing plaintiff has failed to make.

And see also Roy H. Park Broadcasting, Inc. v. Commissioner, 56 T.C. 784, 813 (1971).

Plaintiff argues that whether or not the advertising contracts had a fixed value and a reasonably ascertainable useful life is a factual question. That is correct. But the record here suffers from the same infirmity as the one in Meredith. There is a complete lack of evidence as to the extent to which the contracts provided or failed to provide plaintiff with continuing value beyond their stated terms, or could be expected to do so. There is no information as to the extent to which they were likely or not likely to be renewed, or to give rise or not to give rise to new, expanded or related advertising contracts, and over what period of time. To be entitled to deductions from the revenues for the years at issue, plaintiff "must show that * * * the advertising contracts did not possess any reasonable prospect of continuity." Meredith Broadcasting Co. v. United States, supra, 405 F.2d at 1231, 186 Ct.Cl. at 30. And this showing plaintiff here has also failed to make. Thus, it is not entitled to the deductions sought.

## V. Tangible Assets Of Television Station

On September 16, 1971 and December 17, 1971, plaintiff filed with the Internal Revenue Service nine claims for refund. With regard to the purchase of the television station, plaintiff contended in the claims that it was entitled to deductions for amortization of the covenant not to compete and the FCC license; and loss deductions for the termination of its CBS primary affiliation contract, its ABC secondary affiliation contract, and its advertising contracts. Concerning the newspaper purchase, plaintiff asserted that it was entitled to a greater annual depreciation deduction due to the erroneous valuation by the Commissioner of certain tangible and intangible assets of the newspaper, and a deduction with regard to certain prepaid items. Neither in its claims for refund nor in its petition did plaintiff raise any question as to the correctness of the Service's valuation of the tangible operating assets of the television station.

However, at trial plaintiff for the first time introduced evidence, over defendant's timely objection, concerning the proper fair market value of the tangible operating equipment of the television station purchased by plaintiff, and argues on brief that the operating equipment for the television

station should be valued at $507,725, $100,-337 in excess of the amount allowed by the Internal Revenue Service, entitling plaintiff to larger depreciation deductions. Defendant did not present any evidence on the issue at trial, and submits that irrespective of the merits of plaintiff's contention (which defendant also contests), plaintiff is precluded from raising the issue because it failed to include it in its claims for refund.

Section 7422(a) of the Internal Revenue Code provides that a claim for refund is a necessary prerequisite to a suit for the recovery of taxes. Pursuant to the authority delegated by the statute, Treasury Regulations section 301.6402–2(b)(1) (1955) provides that the claim must "set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof," and that no refund will be allowed "except upon one or more of the grounds set forth in [the timely] claim." This variance rule is designed to prevent surprise; to give the Service adequate notice of the nature of the claim, thereby permitting an administrative investigation and determination; to afford the Service an opportunity to correct its errors; and to limit the scope of any ensuing litigation to those issues which have been examined. *See Union Pacific R.R. v. United States*, 389 F.2d 437, 442, 182 Ct.Cl. 103, 109 (1968).

Plaintiff asserts that it proposed to defendant a stipulation that any change in valuation of the amount of intangible assets in issue, as a result of the trial, should be spread proportionately over the remaining assets acquired, tangible and intangible, but that defendant refused to so stipulate. Therefore, plaintiff contends, it is permitted to revalue every other asset to make up the total purchase price. Plaintiff states that "[t]his process of redistribution of values among all assets is implicit in plaintiff's refund claim." But, since all of the televi-

sion station issues raised involve intangible assets, and since both parties agree that the value of the goodwill of the station should be determined by the residual method, it would be reasonable to infer from the refund claims that any reassignment of values resulting from trial should be compensated for in the residual goodwill valuation. Defendant was under no obligation to stipulate otherwise. Moreover, plaintiff's contention is not that the operating assets should be increased because more of the purchase price is left for the residue but is that it can establish higher values for them by expert testimony. Such allegations of fact and contentions were never brought to the attention of the IRS either explicitly or implicitly in any refund claim. Nor was defendant's attorney even apprised of them sufficiently prior to trial so that he could prepare to meet them at trial upon prepared cross-examination and by valuation testimony of his own. Plaintiff could have preserved the issue of the valuation of the tangible, as well as the intangible, assets of the television station for depreciation deduction purposes, just as it did with regard to the assets in the newspaper purchase, but apparently found no basis for doing so prior to trial.

This is as clear a situation as any recently before the court in which a plaintiff has been barred from raising an issue not set forth in a refund claim. *See Fruehauf Corp. v. United States*, 477 F.2d 568, 201 Ct.Cl. 366 (1973); *Commercial Solvents Corp. v. United States*, 427 F.2d 749, 192 Ct.Cl. 339, *cert. denied*, 400 U.S. 943, 91 S.Ct. 242, 27 L.Ed.2d 247 (1970); *Union Pacific R.R. v. United States*, 389 F.2d 437, 442, 182 Ct.Cl. 103, 109 (1968).[12] Therefore, it is concluded that plaintiff is barred from raising the issue of the valuation of the tangible assets acquired in the television station purchase.

12. Plaintiff alleges that *Barnes v. United States*, 201 Ct.Cl. 879 (1973), opinion reported in full, 34 AFTR 2d 74–5146, supports its position. *Barnes* merely stands for the sound proposition that the court will consider informal as well as formal administrative claims, and will permit liberal amendments to the claim. *See United States v. Kales*, 314 U.S. 186, 62 S.Ct. 214, 86 L.Ed. 132 (1941); *United States v. Andrews*, 302 U.S. 517, 524, 58 S.Ct. 315, 82 L.Ed. 398 (1938).

*Summary—Television Station*

The purchase price paid by plaintiff for all of the operating assets of Station KVTV on December 1, 1965, was $3,928,033. Since both parties agree that the residual method of computing the goodwill of the television station is appropriate, the total sum is allocable as of that date to the various acquired assets in the following manner:

Tangible Assets

| | | |
|---|---|---|
| Tangible operating equipment | $ 407,388 | |
| All other tangible assets | 1,681,986 | |
| Total tangible assets | | $2,089,374 |

Intangible Assets

| | | |
|---|---|---|
| Network affiliation contracts | 1,000,000 | |
| New site agreement | 165,000 | |
| Engineering | 32,000 | |
| Goodwill, including value of FCC license, advertising contracts and covenant not to compete | 641,659 | |
| Total intangible assets | | 1,838,659 |
| Total Purchase Price | | $3,928,033 |

VI. *Marshfield News-Herald Acquisition*

 A. The Value of the Machinery and Equipment.

Between October 30, 1964 and October 20, 1965, plaintiff acquired 80.14 percent of the stock of News Publishing Company of Marshfield, Wisconsin, which published the Marshfield News-Herald, a daily newspaper with a circulation of 13,000. On September 1, 1967, plaintiff acquired the remaining stock of the News Publishing Company which became a wholly owned subsidiary of plaintiff. Thirty days later, on September 30, 1967, plaintiff liquidated the News Publishing Company and received all of its assets pursuant to a plan of liquidation of the subsidiary in compliance with section 334(b)(2) of the Internal Revenue Code.

Section 334(b)(2) treats such an acquisition of stock and subsequent liquidation of the subsidiary as a purchase of the assets of the subsidiary at the purchase price of the stock. The purchase price for the stock is reduced by the cash received on the liquidation and adjusted for transactions during the intervening time between the purchase of the stock and the receipt of the assets. Treasury Regulations section 1.334–1(c)(4) (1956) then provides that:

(viii) * * * [T]he amount of the adjusted basis of the stock adjusted as provided in this paragraph shall be allocated as basis among the various assets received (except cash and its equivalent) both tangible and intangible (whether or not depreciable or amortizable). Ordinarily, such allocation shall be made in proportion to the net fair market values of such assets on the date received * * *.

The parties are in agreement that the adjusted basis for the assets other than cash, as of September 30, 1967, was $989,050. There is also agreement that the fair market value on that date of the assets received in the liquidation, other than cash of $134,928 and the machinery and equipment and goodwill, was $409,312. Thus, the only matters left for determination are the fair market values of the machinery and equipment and the goodwill of the Marshfield newspaper on September 30, 1967.

The revenue agent's report allowed plaintiff a $300,000 value for the machinery and equipment. Plaintiff claims the proper amount should be $541,158, whereas the government contends such value is only $200,000. Since the stock acquisitions occurred between October 30, 1964 and September 1, 1967, and the liquidation took place on September 30, 1967, there is no necessary equivalence between plaintiff's basis for the assets and their fair market value as of September 30, 1967. It is for this reason that the regulation provides that the fair market values are not to be used as the bases of the assets but only to determine the proportionate allocations of the basis. In other words, the plaintiff's cost is to be divided up among the assets in proportion to their fair market values.

■ Plaintiff's valuation is claimed to be supported by the report of an appraisal of the newspaper's tangible assets performed for the newspaper by the Industrial Appraisal Company, Pittsburgh, Pennsylvania, on March 1, 1968, for fire insurance purposes, and by the testimony of an expert witness, Mr. Marion Krehbiel.

Plaintiff did not offer any witness from the Industrial Appraisal Company to support its report, nor did it account for the absence of such a witness; rather, Mr. Anderson, plaintiff's vice president for finance, produced and identified the report for admission into evidence. The government objected to the admission of the report and the court reserved ruling on the admissibility of the document pending the filing of briefs.

Plaintiff contends that the report is admissible pursuant to Rule 803(6) of the Federal Rules of Evidence. This rule provides:

*Hearsay Exceptions; Availability of Declarant Immaterial*

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

$$* \quad * \quad * \quad * \quad * \quad *$$

(6) Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. * * *

It may be noted however that Rule 803 does not provide that the contents of documents kept in the course of a regularly conducted business are necessarily admissible. Rule 802 states that hearsay is not admissible, and Rule 803(6) merely provides that the documents described therein, which may include opinions are not excluded by the hearsay rule. Nothing in Rule 803 says that they may not be excluded by some other rule. Rule 701, Opinion Testimony by Lay Witnesses, provides that "if the witness is not testifying as an expert," his opinions are admissible only if they are based on his own perception. Rule 702, Testimony by

Experts, provides that only a witness "qualified as an expert by knowledge, skill, experience, training, or education" may testify in the form of an opinion as to scientific, technical, or other specialized knowledge. Rule 705, Disclosure of Facts or Data Underlying Expert Opinion, provides that "[t]he expert may in any event be required to disclose the underlying facts or data on cross-examination."

In other words, unless Rule 803(6) is deemed to override the opinion rules, it should not be construed to allow the introduction of expert opinions without opportunity to ascertain the qualifications of the maker, the extent of his study or for other reasons to cross-examine him. Otherwise, the report of every appraiser would be admissible upon the mere showing that the preparer was in the business of making such appraisals, without more.

Some indication of what the inclusion of the word "opinions" in Rule 803(6) was designed to accomplish may be gleaned from the Advisory Committee's Note on the rule. It states (Federal Rules of Evidence, 28 U.S.C.A.):

Note to Paragraph (6). * * *

$$* \quad * \quad * \quad * \quad * \quad *$$

Entries in the form of opinions were not encountered in traditional business records in view of the purely factual nature of the items recorded, but they are now commonly encountered with respect to medical diagnoses, prognoses, and test results, as well as occasionally in other areas. The Commonwealth Fund Act provided only for records of an "act, transaction, occurrence, or event," while the Uniform Act, Model Code Rule 514, and Uniform Rule 63(13) merely added the ambiguous term "condition." The limited phrasing of the Commonwealth Fund Act, 28 U.S.C. § 1732, may account for the reluctance of some federal decisions to admit diagnostic entries. * * Other federal decisions, however, experienced no difficulty in freely admitting diagnostic entries. * * * In order to make clear its adherence to the latter

position, the rule specifically includes both diagnoses and opinions, in addition to acts, events, and conditions, as proper subjects of admissible entries. [Citations omitted.]

The note indicates that, in allowing opinions in business records to be admitted in evidence, the committee meant to choose between two lines of authority, one admitting and the other denying admissibility to diagnostic entries in medical reports containing both the facts found by the doctors and medical technicians and their conclusions from such facts. Review of the cases cited by the committee shows that most of the medical examinations were routine; they were incident to and contemporaneous with accidents or illnesses; they were designed for diagnosis or treatment and there could be no reasonable motive for falsification or shading; and unless the particular medical reports were admitted in evidence the transitory events and medical diagnoses and opinions which were the subject of the reports would not be accurately or fully disclosed. It must be concluded therefore that the opinions referred to in Rule 803(6) are those which are incident to or part of factual reports of contemporaneous events or transactions. On the other hand, reports which are prepared to state or to support expert opinions are not admissible without the preparer being present in court to testify as to his qualifications as an expert and to be cross-examined on the substance, pursuant to Rules 702 and 705.

The record here is not only devoid of any evidence establishing the qualifications of the preparer of the appraisal report in question but fails even to disclose his identity. Therefore, the report does not meet the requirements of Rule 702 and hence is inadmissible as expert testimony with respect to the valuation of property.

The report of the Industrial Appraisal Company does not qualify under Rule 803(6) for other reasons as well. That rule requires that a custodian or other qualified witness testify that the report was "kept in the course of a regularly conducted business activity" and that "it was the regular prac-

tice of that business activity to make the [report]".

Plaintiff asserts that the record was created as part of the regularly conducted business of the Industrial Appraisal Company. But plaintiff has offered no testimony to support that assertion. Thus, plaintiff has not presented the requisite foundation testimony for the report and it must be excluded for this reason too.

Plaintiff's only other evidence in support of its asserted fair market value for the newspaper's machinery and equipment on September 30, 1967, is the testimony of Mr. Marion Krehbiel, a newspaper appraiser-broker-consultant. Up to the date of trial, Mr. Krehbiel had participated as a broker in the sale of 278 newspapers and was past owner or part owner of 16 weekly and daily newspapers.

Krehbiel's initial estimate, made November 18, 1967, was only as to the total value of all of the assets of the newspaper on the date of liquidation, including the cash but excluding the land and buildings. That total estimate was $854,340. A few days later, however, one of plaintiff's officers requested that Krehbiel allocate the total figure to the separate assets of the newspaper acquired by plaintiff. Although Krehbiel submitted the requested allocation on November 29, 1967, he admitted at trial that the appraisal of machinery and equipment was beyond his training and experience. In fact, of all of the newspaper appraisals performed by Krehbiel, this was the first time that he had attempted to break down a total figure estimate into its component parts.

Krehbiel's method of allocation for the machinery and equipment was essentially a process of subtraction. He took the adjusted purchase price then furnished to him by plaintiff ($975,000) and subtracted from that the book values for the net current assets, the land and buildings, and other nondepreciables (including the $62,925 book value for goodwill which is in dispute). The figures that he used for such subtractions were merely the balance-sheet figures of the Marshfield News-Herald on September

30, 1967. After the subtraction, Krehbiel was left with a figure of $675,429, for the value of the remaining assets of the newspaper, the machinery and equipment. That figure struck him as being too high for a paper of that size, and so he reduced the residual figure to his final estimate of $541,158, which he did not explain. Krehbiel stated that he based his opinion upon what a newspaper of the size of the Marshfield News-Herald should have in machinery and equipment assets and that any amount less than $500,000 would have been too low. Krehbiel did not perform an independent appraisal of the machinery and equipment and did not try to put a separate value on any piece of equipment on an item-by-item basis because he said that he was unqualified to do so.

Mr. Robert Cafarella, an Internal Revenue Service engineer, testified for the government on this issue. He has a degree in mechanical engineering and has been employed by the Internal Revenue Service for 11 years as an engineer specializing in the valuation of radio, television and newspaper assets. He had previously valued the assets of about 30 newspapers in the course of three separate audits.

He began by obtaining from the newspaper its original cost figures for 22 major items of machinery and equipment, which aggregated $211,000. To bring the actual cost figures up to their reproduction cost as of September 30, 1967, Cafarella consulted a publication known to appraisers as *Marshall & Swift,* which is a commercially published standard reference work for the appraisal of business assets. The publication provided Cafarella with cost index figures. Such index figures are broken down by industry, including the newspaper industry, and by groups of assets within the industry, such as general machinery and equipment. Cafarella stated that the publication's indices had provided reliable estimates in the past when compared with actual sales prices. The resulting estimate of the full replacement cost of the 22 items on the date of liquidation was $312,000.

Cafarella then gave consideration to the depreciation and obsolescence of the machinery and equipment. He inspected the major pieces of equipment on an item-by-item basis and concluded that a 25-year average economic life for all of them would be reasonable. He then confirmed his judgment with similar estimates in *Marshall & Swift.* He also estimated that there was no excessive wear and tear warranting further depreciation deductions and that no special obsolescence problems had to be taken into account. Based on the above, Cafarella determined that the full replacement cost less depreciation of the 22 items was about $166,000.

Since in Krehbiel's report, furnished to Cafarella by plaintiff, the value of the 22 items represented 84 percent of the total value of the machinery and equipment, Cafarella calculated that the value of 100 percent of such assets on September 30, 1967, was $201,000. He assumed that the original cost figures provided to him included their installation costs, but he added a further 5 percent increase to the total value because all of the items were part of a total working operation. Thus, Cafarella's final estimate for the fair market value of the machinery and equipment on September 30, 1967, was $210,000.

The government's witness, Mr. John O'Farrell, also gave his opinion as to the value of the machinery and equipment. He determined that the original cost of all of the machinery and equipment as provided by the newspaper on its balance sheet as of September 30, 1967, $243,645, represented the highest reasonable in-place value of the newspaper's machinery and equipment. In his opinion, for the years from the installation of the machines to September 30, 1967, the inflation rate for such equipment was not more than 2 or 3 percent per year and any increased cost of reproduction was offset by depreciation and obsolescence at similar or greater rates. O'Farrell assumed that the company's cost records, which it used as its basis for depreciation, included all installation costs, transportation, foundations, employee training for use of the equipment and idle time, because that was

the proper accounting treatment. O'Farrell did not inspect the machinery and equipment.

It is evident that of the three experts Cafarella has made the most credible estimate. He was the only one to actually inspect the machinery and equipment, and the only one to break the property down on an item-by-item basis. He employed standard appraisal techniques in considering inflation, depreciation, obsolescence, and the "turnkey" factor. While O'Farrell has extensive valuation experience including the appraisal of entire newspapers, his experience in valuing newspaper machinery and equipment was limited to but one prior instance. Plaintiff's expert, Krehbiel, was the most experienced of the three with regard to general newspaper appraisals based upon earnings and similar factors. But by his own admission he was not qualified to allocate his total figure among the separate assets of the newspaper, which is the issue herein. His residual method assumed the balance sheet figures were a correct measure of the fair market value of all of the other assets, including goodwill, as of September 30, 1967, a questionable assumption. Finally, his opinion that a newspaper of the size of the Marshfield News-Herald should have machinery and equipment assets valued between $500,000 and $675,000, and his resulting estimate of $541,000, are beside the point. What must be determined is the *fair market value of the machinery and equipment assets that Marshfield actually had*, not what it should have had.

Although Cafarella included in his valuation an additional 5 percent of book cost for the fact that all of the items were part of a working operation, plaintiff insists that the percentage should be increased to at least 20 percent. The 20 percent is based on Krehbiel's testimony that in general 50 percent should be added to the catalog price of newspaper equipment and machinery for installation and integration into the working plant. And it is also based on the fact that in *Miami Valley Broadcasting Corp. v. United States,* 499 F.2d 677, 680, 204 Ct.Cl. 582, 588 (1974), the court affirmed a trial judge's acceptance of the testimony of an expert witness who had added about 24 percent over reproduction cost for turnkey value of the operating equipment of a television station.

The difficulties with using Krehbiel's testimony for this purpose are: First, his confessed inexpertise in the valuation of machinery and equipment; second, his 50 percent included an unknown portion for installation costs; third, his base for computing the 50 percent was catalog cost without installation, whereas Cafarella's base was the newspaper company's own book cost, which under good accounting practice would ordinarily include installation and some or all of the costs of integrating the equipment into an operating whole; and finally, Krehbiel's 50 percent is a mere generalization unsupported by other evidence.

The use of the *Miami Valley Broadcasting Co.* case's 24 percent turnkey value percentage as a standard also presents a number of difficulties. First, the 24 percent approved there was not a legal standard but only a partial acceptance of the testimony of a single expert witness on the facts in that case. Second, it appears that the base to which the 24 percent was applied in that case was also the catalog reproduction cost of the equipment and not the actual installed cost entered on the books, as here. Third, there is no evidentiary basis to compare the cost of integrating the complex electronic broadcasting equipment of a medium-size television station with the typecasting, printing and folding equipment of a newspaper with circulation of only 13,000 copies.

Plaintiff produced no evidence that the News Publishing Company's recorded costs did not reflect fully the costs of transporting and installing its equipment, the costs of teaching its employees how to use it, the paid nonproductive time of its employees while the equipment was being installed, adjustments and hookups of the machines, and other elements which might be included in turnkey value. Thus, in the absence of evidence as to how the property accounts were kept, it cannot be found that the book

value of the machinery and equipment did not already include their so-called turnkey value.

Accordingly, it is determined that the fair market value of the machinery and equipment as of September 30, 1967, was $210,-000.

B. The Goodwill.

 The fair market value of the newspaper's goodwill as of September 30, 1967, remains for determination. Plaintiff says it was only $62,925, its book figure, whereas defendant maintains it was at least $404,-083.[13] The revenue agent originally accepted plaintiff's book figure. Prima facie it would appear that defendant rather than plaintiff is closer to being correct. Otherwise, plaintiff would have paid a net cost of $989,050 for assets worth only $682,237.[14]

The evidence to support plaintiff is derived wholly from the testimony of Gene Anderson, plaintiff's vice president for finance. He stated that he computed the book value of the goodwill at $62,925 through a mathematical formula contained in an Internal Revenue Service ruling, A.R.M. 34, 2 C.B. 31 (1920). This formula capitalizes earnings in excess of those deemed to represent a fair rate of return on the tangible assets alone. In Revenue Ruling 68–609, 1968–2 C.B. 327, which updates and restates A.R.M. 34, such "formula" approach is described as follows:

A percentage return on the average annual value of the tangible assets used in a business is determined, using a period of years (preferably not less than five) immediately prior to the valuation date. The amount of the percentage return on tangible assets, thus determined, is deducted from the average earnings of the business for such period and the remainder, if any, is considered to be the amount of the average annual earnings from the intangible assets of the business for the

period. This amount (considered as the average annual earnings from intangibles), capitalized at a percentage of, say, 15 to 20 percent, is the value of the intangible assets of the business determined under the "formula" approach.

The percentage of return on the average annual value of the tangible assets used should be the percentage prevailing in the industry involved at the date of valuation, or (when the industry percentage is not available) a percentage of 8 to 10 percent may be used.

The 8 percent rate of return and the 15 percent rate of capitalization are applied to tangibles and intangibles, respectively, of businesses with a small risk factor and stable and regular earnings; the 10 percent rate of return and 20 percent rate of capitalization are applied to businesses in which the hazards of business are relatively high.

The Revenue Ruling also states that the above rates are only used as examples and that the average earnings period and the capitalization rates are dependent upon the facts in each case. Furthermore, the ruling states that the "formula" approach "may be used for determining the fair market value of intangible assets of a business only if there is no better basis therefor available." And *see also* Revenue Ruling 65–192, 1965–2 C.B. 259.

Assuming no better method of computing the value of the goodwill was available (on which neither party offered any evidence), the problem is not with Anderson's choice of the A.R.M. 34 formula method but that he failed to produce or reproduce any of the data he claimed to have used in arriving at his conclusion and hence there was no way to examine or verify what he had done. Anderson stated that he had used the newspaper's earnings for the 5 years preceding the valuation date, but he did not produce any earnings figures or records of such

---

13. These positions are consistent with the parties' interest since the lower the figure for goodwill in the proportionate allocation of basis, the higher the basis for depreciation of the tangible assets, and vice versa.

14. This consists of the agreed values of $409,-312, plus machinery and equipment determined to be worth $210,000, plus the $62,925 to which plaintiff would limit goodwill.

earnings. He stated that he had computed a fair return on the physical assets at their historical cost but he did not state the amount of such historical cost, the rate of return he had used, how he had arrived at such rate or the amount of such fair return. He stated that he had capitalized the excess earnings at a 15-percent capitalization rate, but his justification for the use of such rate was merely that most investors want a 13-to-15 percent return on any investment and that the rate was recommended in A.R.M. 34, the 1920 I.R.S. ruling for low-risk businesses. A.R.M. 34 and the revenue ruling state that the higher the risk involved in the business, the greater the percentage rate of return and capitalization rate which should be applied. Anderson testified that his understanding was the exact reverse—that there should be used "a higher rate of return in a low-risk business, a lower rate in a high-risk business." That testimony is certainly far from reassuring.

What remains then is merely the naked assertion by Anderson that, based on his application of the A.R.M. 34 formula method, the fair market value of the goodwill for the newspaper on the date of liquidation was $62,925.

Of course, if Anderson's underlying figures were available, then his calculations could be checked or the formula approach could be properly employed. But such evidence is not in the record. Considering the above, it is decided that his valuation is a mere conclusion, acceptance of which is precluded by the absence of any underlying or supporting data.

Defendant's only witness to value of the goodwill of the newspaper was John O'Farrell. He used the residual method to calculate it, assuming that the plaintiff's adjusted basis for the stock ($989,050) equaled the total fair market value of the tangible and intangible assets other than cash. In that manner, O'Farrell determined that the value of the goodwill was $449,258. However, O'Farrell's figures were prepared before various agreements between the parties and the court's determination of the value of the machinery and equipment. If the

agreed September 30, 1967, $989,050 basis for the assets other than cash was their fair market value as of September 30, 1967, and there is subtracted therefrom the determined value of the machinery and equipment ($210,000) and the agreed values of all of the other assets other than cash ($409,-312), the resultant residue attributed to goodwill by defendant would be $369,738.

Defendant argues that the residual method for computing goodwill in a section 334(b)(2) liquidation was approved by this court in *Jack Daniel Distillery v. United States,* 379 F.2d 569, 579, 180 Ct.Cl. 308, 324–25 (1967), and, therefore, is proper here. But in that case the court found that the buyer and sellers specifically bargained with respect to the amount of goodwill to be included in the purchase price and that the interval between the stock purchase and the liquidation was only 19 days. Thus, there was a basis for the inference that on the date of liquidation the residue of the price not attributable to tangible assets fairly measured the value of the goodwill. Since here the stock was purchased over a period from October 30, 1964 through September 1, 1967, the inference that the aggregate purchase price over that period fairly measured the value of the total tangible and intangible assets on the date of liquidation, September 30, 1967, becomes less persuasive.

Since some value must be attributed to goodwill to enable a fair allocation of basis to the various assets, on the best available evidence in the record that value is determined to be $369,253. Such value is supported by evidence emanating from plaintiff's witness, Krehbiel. Krehbiel himself made no specific valuation of goodwill. He used the $62,925 book figure for goodwill and allocated the excess value he could not attribute to any particular asset to the machinery and equipment as the residue.

Plaintiff first asked Krehbiel to value the entire newspaper enterprise as of September 30, 1967. On November 18, 1967, he submitted a report estimating that apart from the real estate that value was $854,-340, and he reiterated that value at trial.

Adding the real estate appraisal of $269,153 made by others and agreed to by the parties, Krehbiel's appraisal resulted in a total value as of September 30, 1967, in the sum of $1,123,493. Mr. Krehbiel, who had prepared appraisals incident to 300 sales of newspapers, was well-qualified to value an entire newspaper business. His method involved comparing the Marshfield News-Herald to other average newspapers of the same size based on four fundamental factors: the gross revenues of the newspaper, the town's population, the paid circulation of the newspaper, and its net profitability (although by his own admission his method did not permit separate valuation of individual assets). His appraisal of the total assets has not been attacked by either side. Subtracting from the total value of $1,123,493, cash in the sum of $134,928 included in his appraisal, tangible assets other than machinery and equipment which the parties have agreed had values aggregating $409,312, and $210,000 determined herein to be the value of the machinery and equipment, there remains $369,253 in excess value which is not accounted for by any specific asset and which can only be attributed to goodwill. The total goodwill resulting from his appraisal is $369,253.

### Summary—Newspaper

The fair market value of the assets of the Marshfield News-Herald as of September 30, 1967, the date of liquidation of the News Publishing Company by plaintiff in compliance with section 334(b)(2) was:

| | |
|---|---|
| Machinery and Equipment | $210,000 |
| Goodwill | 369,253 |
| All Other Assets | 409,312 |

1. I agree that section 1031(a) should not be held to apply to this case.

2. In *United States v. S.S. White Dental Manufacturing Co.*, 274 U.S. 398, 47 S.Ct. 598, 71 L.Ed. 1120 (1927) and *Post v. Commissioner*, 12 B.T.A. 510 (1928), the unanticipated and gratuitous relief payment was made years after the loss was incurred. In *Parmelee Transportation Co. v. United States*, 351 F.2d 619, 173 Ct.Cl. 139 (1965), the businesses which continued to

### CONCLUSION

The plaintiff is entitled to a deduction in computing its 1967 taxable income to reflect the loss of $572,000 it realized in that year as a result of the termination of its CBS affiliation. The case is remanded to the Trial Division to determine the amount of recovery therefor in accordance with Rule 131(c). In all other respects, plaintiff's claims for refund are denied.

DAVIS, Judge, dissenting in part:

I dissent only from the court's holding that plaintiff's loss upon termination of the CBS network affiliation amounted to $572,000. I would fix that loss at $125,000.

1. Were it not for defendant's concession at the trial level that taxpayer did suffer such a loss, taken together with the stipulation that the two affiliations (CBS and ABC) were worth $1,000,000 in total, I would find it hard to disagree with Trial Judge Miller's conclusion (though not with all of his reasoning) [1] that plaintiff suffered no deductible loss on termination of the CBS agreement. It seems to me immaterial in this instance whether one says that no loss was incurred at all or whether a loss was incurred but compensated for. In either event no deductible loss existed. I do not agree with the court that the bar in section 165(a) of a loss deduction (because it has been "compensated for by insurance or otherwise") applies only if the taxpayer has an existing legal right of recovery for that loss from some source. It is enough, in my view, if the "compensation" comes about simultaneously and as an integral part of the transaction which is claimed to have resulted in the loss.[2] That is precisely what occurred here. The termination of the CBS affiliation and the substitution of the exclu-

prosper had no relation to the one business in which goodwill was lost. In *Shanahan v. Commissioner*, 63 T.C. 21 (1974), the only issue was whether the forgiveness of the indebtedness was a pure gift or in the nature of insurance. None of these cases holds that the compensation mentioned in section 165(a) must always be compensation to which the taxpayer has some legal right.

sive ABC agreement were all part (from plaintiff's standpoint) of a single transaction designed to avoid any loss. As Trial Judge Miller put it: "As astute businessmen, plaintiff's officers took anticipatory action to avoid such loss. Knowing that ABC was anxious to expand its affiliation agreement to cover larger numbers of viewers for its national programs and that ABC would prefer a VHF station to a UHF station in the same area, plaintiff entered into an advantageous deal with ABC. In return for an exclusive ABC affiliation at hourly compensation rates from ABC substantially in excess of what either network had been paying it (40 percent of $900 per hour versus 32 percent or less of $650 per hour), plaintiff would relinquish its primary [CBS] affiliation. * * * It is clear that plaintiff's relinquishment of its CBS affiliation was contingent upon its prior receipt of the new exclusive ABC contract. Plaintiff's witness, Turner, conceded it. Plaintiff's board approved the prospective termination of the CBS affiliation on condition that its officers could obtain from ABC the acceptable contract that they had tentatively negotiated. It is reasonable to infer that ABC offered plaintiff the substantial increase in compensation because it was anxious to expand its viewership and believed that it would take that kind of increased compensation to induce plaintiff to substitute ABC for CBS.

"The record does not reflect the precise value of the exclusive ABC affiliation, but plaintiff's own evidence is that after the station manager's study of plaintiff's broadcast coverage he believed that even without regard to any increase in compensation a full time ABC affiliation was worth more to plaintiff than the CBS affiliation. In addition, the hourly rate for every hour of plaintiff's network broadcasting went up by 38 percent (from $650 to $900) and plaintiff's share of it for prime time alone increased by 25 percent (from 32 to 40 percent). The fact is also that in the year after plaintiff changed to ABC exclusively,

with increased hourly compensation, its network revenues greatly increased over what it had received in the previous year from the two networks, and it turned its fortunes around from a $220,677 net loss to a $108,-655 net profit."

This being the record before us, I do not think that taxpayer can be said to have proved—apart from defendant's concession of a loss—that it suffered an uncompensated loss in the termination of the CBS affiliation. The "loss" taxpayer puts forward did not exist in the real world and should not be recognized for tax purposes. Forward insists, however, that its "loss" of the CBS agreement is exactly the same as if a manufacturer decides to abandon one of two machines and run another at fuller capacity to obtain its needed output. But the network affiliation agreements in this case were not comparable to a machine or other such asset which necessarily has a separate life of its own. These affiliation contracts could not be sold or transferred on their own for value, nor did they have salvage value. Their value inhered in the financial benefits accruing therefrom during the life of the affiliation. In this instance, plaintiff knew when it purchased the station that one of the two affiliations would have to be relinquished in 2½ years. And if, when that time came, plaintiff could arrange (as it did) with ABC to give it all the benefits it had previously had from the dual affiliation (or more), it would suffer no loss, or at least no uncompensated loss. The court assumes that, after the CBS affiliation was terminated in 1967, the plaintiff no longer had the financial benefits arising from dual affiliation. But that assumption seems to me to run counter to the trial judge's factual analysis—set forth, *supra* —which shows that taxpayer deliberately sought and obtained a distinctly better "deal" with its exclusive ABC affiliation than it had had in the previous 2½ years.

The prior cases on dual affiliation contracts[3] do not point us the other way because in none of them was there a claim or

**3.** *Meredith Broadcasting Co. v. United States,* 405 F.2d 1214, 186 Ct.Cl. 1 (1968); *Roy H. Park Broadcasting, Inc. v. Commissioner,* 56 T.C. 784 (1971); *Miami Valley Broadcasting Corp. v. United States,* 499 F.2d 677, 204 Ct.Cl. 582 (1974).

a showing that on termination of one network agreement another such contract was designed to and did take over the whole ground (and more). The present case is significantly new in that respect.

2. The fact remains that defendant did concede a loss; on that point I concur with the court. This important concession cannot be disregarded since taxpayer might very well have tried its case differently if the Government had maintained that there was no uncompensated loss at all. In the circumstances, I am thrust into the difficult position of evaluating a loss where, to my mind, the present record shows that plaintiff has failed to prove any. For me the solution is to hold that plaintiff, which has the burden, has failed to demonstrate any loss greater than the $125,000 which defendant's expert found as the extra value of a dual affiliation. True, the expert's analysis is subject to infirmities pointed out by the court. But taxpayer has the burden and it has not proven any greater loss. On the view I have taken in part 1, *supra*, plaintiff's value of $572,000 is quite excessive, theoretical, and erroneous. The only other figure in the record (put forth by defendant itself) is $125,000.[4]

**4.** I do not share defendant's view that plaintiff should have amortized the $125,000 over the 2½ years following the purchase of the station. There is insufficient basis in this record for thinking that taxpayer could or should have determined in advance that there existed a $125,000 asset to be amortized.